# SUPREME COURT OF THE STATE OF CALIFORNIA

---

### *PEOPLE OF THE STATE OF CALIFORNIA*

*Plaintiff and Respondent*

*v.*

### *JOSEPH ALFONSO DURAN*

*Defendant and Appellant*

---

Petition for Review of the Unpublished Decision of the
Court of Appeal, Fourth District, Division One,
Affirming Judgment of the San Diego County
Superior Court in Case SCS181667

Court of Appeal No. D0047059

# PETITION FOR REVIEW
# TO EXHAUST STATE REMEDIES

*Doris M. Frizzell, SBN 145260*
*P.O. Box 962*
*Salida, CO 81201*
*Telephone: (719)539-6295*

*Attorney for Petitioner*
*By Appointment Of The Court Of Appeal*

# SUPREME COURT OF THE STATE OF CALIFORNIA

### *PEOPLE OF THE STATE OF CALIFORNIA*

Plaintiff and Respondent

**vs.**

### *JOSEPH ALFONSO DURAN*

Defendant and Appellant

**TO:   THE HONORABLE RONALD M. GEORGE, CHIEF JUSTICE, AND
TO THE HONORABLE ASSOCIATE JUSTICES OF THE
CALIFORNIA SUPREME COURT:**

Petitioner Joseph Alfonso Duran (hereinafter,

"appellant") respectfully petitions for review of the

unpublished decision of the Court of Appeal, Fourth

Appellate District, Division One (per Benke, Acting

P.J.), filed January 16, 2007. The Court of Appeal

affirmed the judgment. This petition presents no grounds

for review under California Rules of Court, rule 28(b).

The petition is filed solely to exhaust state remedies

for purposes of litigation in the federal courts.

A copy of the opinion ("Opinion") is attached to

this petition as an Appendix.

/ / /

1

731.) The court denied the new trial motion, reasoning that the information contained in the detective report would not lead to a different result. (RT 731.)

**B.    *The Law*.**

1.    **Fourteenth Amendment.**

The due process clause of the Fourteenth Amendment requires the prosecutor disclose to the defense exculpatory evidence. (*Brady v. Maryland* (1963) 373 U.S. 83.) The duty to disclose exists even in the absence of a request by the accused, and encompasses impeachment as well as exculpatory evidence. (*United States v. Bagley* (1985) 473 U.S. 667, 676; *United States v. Agurs* (1976) 427 U.S. 97, 107.) In order to comply with these requirements, the prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case. (*Kyles v. Whitley* (1995) 514 U.S. 419, 438.)

In order to show a *Brady* violation, the accused must demonstrate that the evidence was favorable to him; that the evidence was suppressed by the State, either willfully or inadvertently; and that he has been prejudiced. (*People v. Salazar* (2005) 35 Cal.4th 1031, 1043.) Prejudice is evaluated by examining the materiality of the information, but the materiality and

5

digest, and effectively act on the contents of the report at the last minute on what was effectively the last day of trial. Disclosure of information concerning two exculpatory witnesses at this late stage of the proceedings was untimely and unfair. (See *People v. Robinson* (1995) 31 Cal.App.4th 494, 501-502 [disclosure of a previously-unknown eyewitness on a Friday near the end of trial (the case went to the jury the following Tuesday) was "too late"].)

### E.    *The Suppressed Information Was Material.*

The Court of Appeal found that had the information in the police report been material, the government failed to meet its discovery obligations. (Opinion 9-10.) However, the Court of Appeal concluded the information was not material. Appellant takes issue with this conclusion because the opinion does not take into account the impact of appellant's own testimony.

In his testimony, appellant explained that on the day of the carjacking he was at his home, had attended an NA/AA meeting there, and had lunched with a friend. (RT 589, 596-597.) He also explained that he had borrowed the jeep from a neighbor to run errands because his car was out of gas. (RT 590-591.)

verdict." (RT 728.) The court cited *People v. Davis*
(1995) 10 Cal.4th 463, 524 for this standard. However,
*Davis* was a case involving a motion for new trial based
on insufficiency of the evidence, not a *Brady* violation.
(*Id.* at p. 523.)

The trial court further explained the standard it
applied by enunciating the standard applicable to claims
of newly-discovered evidence. (RT 728-729.) At no point
in its ruling did the trial court refer to or apply the
correct standard applicable to a ruling on a *Brady* claim.

The correct standard by which a *Brady* claim is to be
evaluated was explained at length in *In re Brown, supra,*
17 Cal.4th at pp. 886-887. In particular, it is
noteworthy that "'a showing of materiality does not
require demonstration by a preponderance that disclosure
of the suppressed evidence would have resulted ultimately
in the defendant's acquittal... .'" (*Id.* at p. 886,
quoting *Kyles v. Whitley, supra,* 514 U.S. at p. 434.)
And, the test "'is not a sufficiency of evidence test. A
defendant need not demonstrate that after discounting the
inculpatory evidence in light of the undisclosed evidence
there would not have been enough left to convict.'" (*In
re Brown, supra,* 17 Cal.4th at pp. 886-887, quoting *Kyles
v. Whitley, supra,* 514 U.S. at pp. 434-435.)

13

would not have changed the result. The Court of Appeal affirmed based on the same conclusion.

The trial court's ruling is flawed in two respects. First, as already discussed, the trial court's assessment of the import of the new information was factually incorrect. The trial court concluded that the two new witnesses had not stated that appellant was not the carjacker. (RT 731.) But, by failing to pick appellant's picture out of a photo lineup, those witnesses did, in effect, state that appellant was not the carjacker.

Second, the trial court failed to take into account the impact of the new evidence on the separate charges. In the court's mind, the fact appellant was apprehended driving the vehicle was virtually conclusive on the issue of whether he was the carjacker. (RT 731.) This conclusion is not worthy of deference. However probative appellant's possession of the vehicle was with respect to the charges involving possession of a stolen vehicle, his possession of the vehicle the day after it was carjacked did not conclusively prove he was the carjacker.

As to the carjacking and robbery, the only evidence directly linking appellant to those crimes was the identification by Garcia. No clothes were found in his possession matching the clothing worn by the carjacker.

# APPENDIX

**Opinion of the Court of Appeal**

Garcia later identified Duran in a photographic lineup. At trial Garcia testified he was 100 percent positive Duran was the carjacker.

On the morning of the last day of trial, just before proceedings commenced, the prosecutor gave Duran a three-page police report, entitled "Detective Follow-up Report." The prosecutor had just received the report himself. The report documented the results of the photographic line-up shown to Garcia, Ochoa, the other car salesman on the lot, and Rachel Robinson, another employee of the dealership. According to the report, Ochoa told the detective he did not believe he could identify the man who drove away with Garcia and when Ochoa was shown the photographic lineup Ochoa was unable to make any identification. On the morning of January 11, 2004, Robinson had also been contacted by a Hispanic man who was interested in a Jeep Wrangler. Robinson was uncomfortable about him and referred him to another sales representative. She later heard about the carjacking. When the detective showed Robinson the photographic lineup, she was unable to make any identification.

After briefly reviewing the report, Duran asked that any reference to Ochoa's and Robinson's statements be excluded. The trial court advised Duran that his objection was premature because no such statements had been offered and because neither Ochoa nor Robinson were on the prosecutor's witness list.

Duran took the stand on his own behalf. He denied being the carjacker and explained that he had borrowed his neighbor's jeep to run some errands because his car was out of gas. He further testified that if he had been the carjacker he would not have

4

of *Brady* error. First, '[a]lthough the constitutional duty is triggered by the potential

impact of favorable but undisclosed evidence, a showing of materiality does not require

demonstration by a preponderance that disclosure of the suppressed evidence would have

resulted ultimately in the defendant's acquittal (whether based on the presence of

reasonable doubt or acceptance of an explanation for the crime that does not inculpate the

defendant). [Citations.] *Bagley's* touchstone of materiality is a "reasonable probability"

of a different result, and the adjective is important. The question is not whether the

defendant would more likely than not have received a different verdict with the evidence,

but whether in its absence he received a fair trial, understood as a trial resulting in a

verdict worthy of confidence.' (*Id.* at p. 434.)

"Second, 'it is not a sufficiency of evidence test. A defendant need not

demonstrate that after discounting the inculpatory evidence in light of the undisclosed

evidence, there would not have been enough left to convict. The possibility of an

acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict.

One does not show a *Brady* violation by demonstrating that some of the inculpatory

evidence should have been excluded, but by showing that the favorable evidence could

reasonably be taken to put the whole case in such a different light as to undermine

confidence in the verdict.' (*Kyles, supra,* 514 U.S. at pp. 434-435.)

"Third, 'once a reviewing court applying *Bagley* has found constitutional error

there is no need for further harmless-error review.' (*Kyles, supra,* 514 U.S. at p. 435.)

The one subsumes the other. (*Id.* at pp. 435-436.)

8

## PROOF OF SERVICE BY MAIL

I, the undersigned, am a citizen of the United States, residing in the State of Colorado; I am over eighteen years old and not a party to this action. My business address is P.O. Box 962, Salida, CO 81201, in the Chaffee County.

On **February 13, 2007**, I served **appellant's Petition for Review** in **People v. Joseph Alfonso Duran, Case No. D047059**, by placing a copy thereof with postage prepaid in the U.S. mail, addressed as follows:

Court of Appeal, Fourth District, Division One
750 "B" Street, Suite 300
San Diego, CA  92101

Office of the Attorney General
P.O. Box 85266
San Diego, CA 92186-5266

Appellate Defenders, Inc.
555 West Beech Street, Suite 300
San Diego, CA 92101

Joseph Duran   V95938
P.O. Box 799004
San Diego, CA  92179

William D. Daley
Attorney at Law
535 "H" Street
Chula Vista, CA 91910

Office of the District Attorney
Appellate Division
330 West Broadway, Suite 920
San Diego,  CA  92101-3803

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Salida, Colorado on _____, 2007.


_____
Doris M. Frizzell

1        MR. DURAN:  PAGE 3.

2        THE COURT:  IT'S PAGE 4 ON MINE --

3        MR. BHAYANI:  YES.

4        THE COURT:  -- WHERE HE LISTS THE WITNESSES.

5        MR. DURAN:  I'M SORRY.  THIS WAS THE FIRST TIME,

6   JANUARY THE 24TH, WHEN WE WERE IN COURT THAT I --

7        THE COURT:  TELL ME WHO YOU SAY YOU DON'T HAVE.  HE

8   HAS THE LIST OF WITNESSES HERE.

9        MR. DURAN:  NEVER RECEIVED INFORMATION OR A LIST OF

10   HAYDEN RUSSELL, NICOLE ROMERO.

11        THE COURT:  OKAY.  RUSSELL, ROMERO, AND WHO ELSE?

12        MR. DURAN:  MARTIN.

13        THE COURT:  MARTIN.  OKAY.

14        MR. DURAN:  I BELIEVE IT'S PRONOUNCED INNISS,

15   I-N-N-I-S-S, BURGESS.

16        THE COURT:  BURGESS.

17        MR. DURAN:  BURGESS, CORDERO.

18        THE COURT:  OKAY.  NATIONAL CITY POLICE.  OKAY.

19        MR. DURAN:  NONE OF THAT WAS GIVEN TO ME ON MY

20   TIMELY FILING OF MINE FOR DISCOVERY, NOT TO MENTION --

21        THE COURT:  WELL, LET'S DEAL WITH ONE THING AT A

22   TIME.  IT'S EASIER FOR ME TO DO THAT TO KEEP TRACK.

23        MR. DURAN:  VERY WELL.

24        THE COURT:  MR. BHAYANI, LET'S START WITH BURGESS

25   SINCE HE'S THE FIRST ON YOUR LIST.  WELL, THE FIRST IS

26   ESTELLE CORDERO, NATIONAL CITY POLICE DEPARTMENT.

27        MR. BHAYANI:  MS. CORDERO IS THE INDIVIDUAL THAT

28   CREATED THE PHOTO LINE-UP, AND IT'S PART OF THE

1    DISCOVERY, PAGE 17, THAT WAS A PACKET OF 112 PAGES.

2    ACTUALLY, IT WAS MORE THAN THAT, JUDGE.  IT WAS CLOSE TO

3    A HUNDRED -- INITIALLY IT WAS 112.  THEN, WITH PRIORS, IT

4    WAS AN ADDITIONAL 36 PAGES.

5        THE COURT:  LET ME STOP YOU.

6        MR. BHAYANI:  I PAGINATED ALL OF MY DISCOVERY ON THE

7    PACKET THAT WAS SUBMITTED TO MR. DURAN, AND THAT WAS ON

8    1/20/04.

9            ACTUALLY, I HAVE A RECEIPT OF HIS -- IT WAS

10   DELIVERED TO A -- A DEPUTY AT THE CENTRAL JAIL, BECAUSE

11   THAT'S WHERE HE'S HOUSED.  WE WENT THERE TO HAND

12   DELIVERED THE PACKET.

13           HE WAS HERE IN SOUTH BAY.  SO THE DEPUTY WHO WAS

14   IN CHARGE OF MR. DURAN INDICATED, "I KNOW HIM.  I'LL COME

15   IN AND TESTIFY THAT I DID, IN FACT, SUBMIT THIS

16   INFORMATION TO MR. DURAN."

17           I ASKED MR. DURAN YESTERDAY IF HE RECEIVED IT,

18   AND HE TOLD ME THAT HE DID, IN FACT, RECEIVE THAT.  HE

19   CLAIMED THAT IT WAS UNTIMELY, BUT HE DID, IN FACT,

20   RECEIVE IT.

21           SO CORDERO IS THE OFFICER WHO CREATED THE PHOTO

22   LINE-UP.  IT'S PAGE 17 AND PAGE 18, AND THAT'S THE

23   LIMITED INVOLVEMENT OF OFFICER CORDERO.

24       THE COURT:  OKAY.  JAMES BURGESS.

25       MR. BHAYANI:  BURGESS IS THE USED CAR SALES MANAGER

26   WHO WAS INSTRUCTED BY MR. GARCIA, WHEN HE CAME BACK TO

27   THE LOCATION AFTER BEING CARJACKED, TO CALL 911.  SO

28   HE -- THE TAPE HAS BEEN PROVIDED.  A TRANSCRIPT OF

1     MR. DURAN: YOUR HONOR, IF I MAY?

2     THE COURT: YES, SIR.

3     MR. DURAN: I'D LIKE TO BRING THE COURT'S ATTENTION

4  TO THE DETECTIVE FOLLOW-UP REPORT THAT MR. BHAYANI CLAIMS

5  WAS JUST HANDED TO HIM.

6     THE COURT: I DON'T HAVE ANY REPORT, SO I DON'T KNOW

7  WHAT YOU'RE SPEAKING ABOUT.

8     MR. DURAN: MAYBE YOU WOULD ASK THE PROSECUTOR FOR

9  THAT REPORT.

10     THE COURT: YOU TELL ME. THE COURTS NORMALLY DON'T

11  GET REPORTS.

12     MR. DURAN: IT'S A COPY OF THE DETECTIVE FOLLOW-UP

13  REPORT BY OFFICER E. CORDERO, THE SIX-PACK PHOTO LINE-UP

14  OFFICER. IN IT IS A DETECTIVE FOLLOW-UP REPORT THAT'S

15  CUMULATIVE TO OFFICER GISI'S REPORT AND MINUS THE

16  SIX-PACK PHOTO LINE-UP STATEMENT BY JOSE GARCIA.

17     THE COURT: WHAT'S THE POINT?

18     MR. DURAN: WHAT I'M ASKING THE COURT IS TO EXCLUDE

19  THIS STATEMENT BY OFFICER CORDERO AS IT'S CUMULATIVE.

20  IT'S THE EXACT REPLICA OF OFFICER GISI'S STATEMENT AS

21  TO -- I'M SORRY. AS TO HIS INVESTIGATION FROM

22  MR. GARCIA.

23     THE COURT: OKAY. LET ME ASK YOU THIS: DOES THAT

24  OFFICER SAY: I SHOWED HIM A LINE-UP, THAT HE IDENTIFIED

25  YOU AS THE PERPETRATOR?

26     MR. DURAN: MINUS THAT I ASK TO BE EXCLUDED.

27     THE COURT: WELL, WHAT IS IT THAT --

28     MR. DURAN: IT STATES THAT ON JANUARY THE 11TH

1    OFFICER GISI TOOK A CARJACKING REPORT.  ACCORDING TO THIS

2    REPORT, A HISPANIC MALE APPROACHED GARCIA, INQUIRED ABOUT

3    A JEEP 2000, TOOK IT FOR A TEST DRIVE, DROVE OFF THE

4    PARKING LOT, GARCIA IN THE PASSENGER SEAT.  SUSPECT

5    PULLED INTO A PARKING LOT, ASKED GARCIA TO REMOVE A

6    BALLOON.  GARCIA EXITED THE JEEP.  SUSPECT LIFTED HIS

7    SHIRT, EXPOSING HANDLE OF A BLACK MEDIUM HANDGUN.

8    SUSPECT TOLD GARCIA, "WHY DON'T YOU GET THE FUCK OUT?"

9    SUSPECT DROVE OFF WESTBOUND.

10         I MEAN, IT'S IDENTICAL TO MR. -- OFFICER GISI'S

11   REPORT, AND IT BRINGS NO NEW INFORMATION TO -- THAT WOULD

12   HELP THE JURY IN DETERMINING INNOCENCE OR GUILT.

13        THE COURT:  SHOWS THAT THE WITNESS HAS BEEN

14   CONSISTENT IN HIS DESCRIPTION OF WHAT HAPPENED.

15        MR. DURAN:  WELL, THAT STATEMENT WAS MADE FIVE

16   MINUTES OR TWO MINUTES AFTER THE ALLEGED CRIME HAPPENED.

17   I MEAN, I THINK THAT IN ITSELF IS HIS STATEMENT.

18        THE COURT:  BUT THE POINT BEING, YOU ASKED HIM ABOUT

19   HIS PRIOR CONVICTION FOR THE PURPOSE OF ATTEMPTING TO

20   IMPEACH HIM, TO TELL THE JURY THAT HIS TESTIMONY IS NOT

21   TO BE BELIEVED --

22        MR. DURAN:  WELL, ACTUALLY, YOUR HONOR --

23        THE COURT:  -- IS THAT RIGHT?

24        MR. DURAN:  -- NO.  WHAT I WAS --

25        THE COURT:  WHY DID YOU ASK HIM ABOUT HIS FELONY

26   CONVICTION?

27        MR. DURAN:  TO IMPEACH HIS TESTIMONY.

28        THE COURT:  AND SO WHAT HE'S TRYING TO DO IS -- WITH

1      THE OFFICER, IS REHABILITATE HIM TO SHOW THAT THIS

2   WITNESS HAS BEEN CONSISTENT IN DESCRIBING WHAT HAPPENED.

3      MR. DURAN:  THE STATEMENT DOESN'T SAY THAT "GARCIA

4   TOLD ME."  IT'S JUST A NARRATIVE.  IT DOESN'T SAY,

5   "MR. GARCIA TOLD ME, OFFICER E. CORDERO," AND THEN THE

6   STATEMENT READS ON.  IT JUST STATES ON, "JANUARY 11,

7   2004," AND THEN AS I READ EARLIER.

8      THE COURT:  OKAY.  AND PART OF THE PROBLEM, I THINK,

9   MR. DURAN, IS THAT NOT BEING LEGALLY TRAINED, YOU ARE

10   IMPOSING WHAT YOU THINK THAT POLICE REPORTS OUGHT TO SAY

11   RATHER THAN WHAT POLICE REPORTS NORMALLY DO SAY.

12      SO, MR. BHAYANI?

13      MR. BHAYANI:  JUDGE, I WAS JUST GOING TO COMMENT

14   THAT THE REPORT THAT MR. DURAN IS REFERRING TO THERE IS A

15   SYNOPSIS OF THE CRIME WHICH HE JUST READ TO THE COURT.

16   CORDERO'S TESTIMONY, SO THAT MR. DURAN KNOWS AHEAD OF

17   TIME, IS REALLY REGARDING THE CONSTRUCTION OF THE PHOTO

18   LINE-UP AND THE PRIOR IDENTIFICATION OF MR. DURAN BY

19   MR. GARCIA.  SO MAYBE THAT WILL HELP HIM.

20      MR. DURAN:  IS THAT INDICATING -- AGAIN, AS YOU JUST

21   NOTED, I'M NOT A PROFESSIONAL LAWYER.  IS THE PROSECUTION

22   TELLING ME THAT HE'S NOT GOING TO ASK OFFICER CORDERO TO

23   READ AN IDENTICAL REPORT THAT WAS ISSUED BY OFFICER GISI?

24   IS THAT WHAT HE'S SAYING?

25      THE COURT:  I DON'T KNOW IF THAT'S WHAT HE'S SAYING,

26   BUT EVEN IF HE ASKS THOSE SAME QUESTIONS, THE OBJECTION,

27   ON CUMULATIVE, GROUNDS WOULD BE OVERRULED.

28      THIS BOILS DOWN TO WHETHER YOU BELIEVE

1  MR. GARCIA. AND YOU MADE MUCH OF THE FACT THAT, YOU

2  KNOW, DID THE WITNESS SAY THAT HE POINTED A GUN AND HE

3  SHOWED HIM A GUN, TRYING TO CREATE IN THE MINDS OF THE

4  JURY THAT THIS TESTIMONY IS TO NOT BE BELIEVED.  AND WHEN

5  HE TELLS THE SAME ACCOUNT OVER AND OVER AGAIN, THEN THE

6  JURY CAN SAY, WELL, YOU KNOW, THERE IS THIS THING CALLED

7  THE PRIOR CONSISTENT STATEMENT, UNDER PEOPLE VERSUS

8  GREEN, WHICH SAYS THAT THE STATEMENT MADE EARLIER IN

9  TIME -- THE JURY CAN CONSIDER THAT AND CONCLUDE THAT THAT

10  IS THE TRUTH OF THE MATTER STATED.

11       SO THE OBJECTION, ON CUMULATIVE GROUNDS, WILL BE

12  OVERRULED.

13  MR. DURAN:  DOES MR. BHAYANI PLAN ON CALLING RAQUEL

14  MARTINEZ ROBINSON AND OSCAR OCHOA AS WITNESSES?

15  THE COURT:  I DON'T KNOW, SIR.

16  MR. BHAYANI:  I HAVE PROVIDED TO BOTH THE COURT AND

17  MR. DURAN A WITNESS LIST, AND SO HE'S ON NOTICE AS TO THE

18  WITNESSES I INTEND TO CALL.

19  MR. DURAN:  SEEING THAT THESE NAMES, YOUR HONOR, ARE

20  NOT ON THE WITNESS LIST, CAN THE STATEMENTS STILL BE READ

21  IN COURT WITHOUT THE ACTUAL WITNESSES?

22  THE COURT:  SIR, I CAN'T GIVE YOU LEGAL ADVICE.  I

23  TOLD YOU THAT FROM THE OUTSET, AND YOU KEEP ASKING ME

24  QUESTIONS ABOUT WHAT IS LEGALLY PERMISSIBLE.

25       WHAT THE COURT DOES IS IT RULES WHEN EVIDENCE IS

26  OFFERED AND SOME OBJECTION IS MADE.

27  MR. DURAN:  THEN THE DEFENSE MOVES TO EXCLUDE THE

28  STATEMENTS OF THE OFFICER'S NARRATIVE BY RAQUEL MARTINEZ

1    ROBINSON AND OSCAR OCHOA ON THE GROUNDS --

2         THE COURT:  WELL, SINCE THERE IS NO OCHOA ON THE

3    WITNESS LIST AND HE JUST TOLD YOU HE ONLY PLANNED ON

4    CALLING THE PEOPLE ON THE WITNESS LIST, I DON'T

5    UNDERSTAND YOUR MOTION.

6         MR. DURAN:  THAT THIS CAN'T BE READ AS A NARRATIVE

7    BY OFFICER CORDERO SINCE THESE PEOPLE AREN'T HERE TO

8    TESTIFY TO THE TRUTH -- TO THE VALIDITY OF WHAT THEY --

9    WHAT'S IN THE REPORT.

10        THE COURT:  WELL, SIR, HE CAN'T READ -- WELL, THERE

11   IS NO WITNESS ON THE STAND WHO IS OFFERING TESTIMONY.  IF

12   THAT WITNESS IS UP AND YOU HAVE SOME OBJECTION, MAKE YOUR

13   OBJECTION THEN, AND THE COURT WILL RULE.

14        MR. DURAN:  THANK YOU, YOUR HONOR.

15        MR. BHAYANI:  MAY I BE EXCUSED TO GET A STATUS ON

16   WHAT'S GOING ON?

17        THE COURT:  YES.

18        MR. BHAYANI:  THANK YOU.

19           (PAUSE.)

20           (THE FOLLOWING PROCEEDINGS WERE HELD OUT

21        OF THE PRESENCE AND HEARING OF THE JURY:)

22        THE COURT:  MR. DURAN?

23        MR. DURAN:  I THINK I ALSO SHOWED THE JURY THE

24   GLASSES.

25        THE COURT:  YES.  THAT WAS THE LAST THING THE JURY

26   WAS LOOKING AT, THE GLASSES, AND I SAID, AS SOON AS THE

27   JURY WAS DONE, WE'D -- REVIEWING THE GLASSES, WE'D BREAK.

28           AND GENTLEMEN, IT IS VERY TIME CONSUMING TO SHOW

1            (PAUSE.)

2      BY MR. BHAYANI:

3            Q.   HOW LONG HAVE YOU BEEN SO EMPLOYED?

4            A.   14 YEARS.

5            Q.   I'M GOING TO TAKE YOU BACK TO JANUARY 14, 2004.

6      WERE YOU ONE OF THE DETECTIVES THAT CONDUCTED A FOLLOW-UP

7      INVESTIGATION REGARDING AN ARMED CARJACKING THAT HAD

8      TAKEN PLACE ON 1/11/04 AT THE MCCUNE CHRYSLER DEALER?

9            A.   YES, SIR.

10           Q.   DID YOU HAVE SOME INFORMATION REGARDING A

11     SUSPECT THAT HAD BEEN ARRESTED INSIDE THAT JEEP ON

12     1/12/04?

13           A.   I DID.

14           Q.   AFTER RECEIVING THAT INFORMATION, DID YOU

15     CONDUCT SOME FOLLOW-UP INVESTIGATION?

16           A.   I DID.

17           Q.   DID YOU CONSTRUCT A PHOTOGRAPHIC LINE-UP TO SHOW

18     THE WITNESSES, INCLUDING THE VICTIM, TO SEE IF THEY COULD

19     IDENTIFY THE SUSPECT?

20           A.   YES, I DID.

21           Q.   AND I WANT TO SHOW YOU WHAT HAS BEEN PREVIOUSLY

22     MARKED AS COURT'S EXHIBIT 9 AND 10.   LET'S TAKE EXHIBIT 9

23     FIRST.  DO YOU RECOGNIZE THIS PARTICULAR EXHIBIT?

24           A.   YES.   IT'S A PHOTO LINE-UP I PUT TOGETHER TO

25     SHOW THE WITNESSES, OR THE VICTIM.

26           Q.   AND WHAT IS DEPICTED IN COURT'S EXHIBIT 10?

27           A.   IT'S A BLACK AND WHITE COPY OF THE COLORED ONE,

28     AND IT'S CIRCLED, INITIALED AND DATED BY THE VICTIM THAT

1    IDENTIFIED THE SUSPECT WHEN I SHOWED HIM THE PHOTO

2    LINE-UP.

3        Q.   OTHER THAN THE MARKINGS ON IT, IS IT A DUPLICATE

4    OF EXHIBIT -- COURT'S EXHIBIT 9?

5        A.   YES.

6        Q.   DID YOU HAVE A PERSON BY THE NAME -- THE

7    SUSPECT, MR. DURAN, PLACED IN THIS SIX-PACK THAT IS NOW

8    DEPICTED AS COURT'S EXHIBIT 9 AND 10?

9        A.   YES, I DID.

10       Q.   WHAT POSITION WAS MR. DURAN'S PHOTOGRAPH PLACED

11   IN?

12       A.   NUMBER 5.

13       Q.   DID YOU RANDOMLY SELECT THAT PARTICULAR

14   LOCATION?

15       A.   YES.

16       Q.   HOW DID YOU SELECT THE OTHER FIVE PEOPLE THAT

17   APPEAR ON THIS PHOTOGRAPHIC LINE-UP?

18       A.   IT'S A NETWORK THAT THE SHERIFFS USE, AND WHAT I

19   DO IS I SELECT THE INDIVIDUAL IN QUESTION, AND THEN JUST

20   A WHOLE BUNCH OF OTHER PICTURES POP UP.  AND I TRY TO

21   SELECT PICTURES THAT ARE SIMILAR TO THE INDIVIDUAL IN

22   QUESTION.

23       Q.   AND TRY TO MAKE IT A FAIR PHOTOGRAPHIC LINE-UP?

24       A.   THAT IS CORRECT.

25       Q.   AFTER YOU CONSTRUCTED THIS PHOTOGRAPHIC LINE-UP,

26   DID YOU --

27       THE COURT:  LET ME STOP YOU.  YOU SAY THE SHERIFF'S

28   NETWORK.  ARE YOU TALKING ABOUT A COMPUTER NETWORK?

1          THE WITNESS:  YES, SIR.

2     BY MR. BHAYANI:

3          Q.  THANK YOU.

4          AFTER YOU CONSTRUCTED THIS PHOTOGRAPHIC LINE-UP,

5     DID YOU HAVE AN OCCASION TO CONTACT THE ALLEGED VICTIM,

6     MR. GARCIA?

7          A.  YES, I DID.

8          Q.  AND WAS THIS DONE ON 1/14/04?

9          A.  YES, SIR.

10         Q.  DID YOU GO TO HIS LOCATION WHERE HE WAS WORKING

11    AT THE TIME?

12         A.  NO.  INITIALLY I CALLED THE BUSINESS, AND HE

13    WASN'T IN.  I LEFT A MESSAGE, AND THEN HE CAME TO OUR

14    POLICE STATION, AND THAT'S WHERE I SHOWED HIM THE PHOTO

15    LINE-UP.

16         Q.  PRIOR TO SHOWING HIM THE PHOTOGRAPHIC LINE-UP,

17    DID YOU READ HIM THE PHOTOGRAPHIC LINE-UP ADMONISHMENT?

18         A.  ABSOLUTELY.

19         Q.  AND DOES THAT ADMONISHMENT THAT YOU READ TO HIM

20    APPEAR ACTUALLY WRITTEN ON THE EXHIBITS THAT I SHOWED

21    YOU, 9 AND 10?

22         A.  THERE IS AN ADMONISHMENT THERE, BUT WE USE OUR

23    OWN FORM IN NATIONAL CITY, AND THAT'S THE ADMONISHMENT

24    THAT I READ.

25         Q.  IS IT A DUPLICATE OF THE ADMONISHMENT --

26         A.  YES.

27         Q.  LET ME FINISH MY QUESTION.

28         A.  SORRY ABOUT THAT.

1          Q.   I WANT TO MAKE SURE THAT WE'RE ON THE SAME PAGE.

2               IS IT A DUPLICATE OF WHAT APPEARS IN EXHIBITS 9

3     AND 10 THAT YOU HAD AN OCCASION TO SHOW MR. GARCIA?

4          A.   YES.

5          Q.   DID IT APPEAR TO YOU, AFTER YOU READ THIS

6     LINE-UP ADMONISHMENT, THAT MR. GARCIA UNDERSTOOD THE

7     LINE-UP ADMONISHMENT?

8          A.   YES.

9          Q.   AFTER YOU DID THAT, DID YOU THEN SHOW HIM THE

10    SIX-PACK?

11         A.   YES, SIR.

12         Q.   DID HE IDENTIFY, POSITIVELY IDENTIFY, THE

13    SUSPECT THAT HAD CONDUCT -- ACTUALLY COMMITTED THE CRIME,

14    THE CARJACKING ON 1/11/04?

15         A.   YES, SIR.

16         Q.   AND WHO DID HE IDENTIFY?

17         A.   MR. DURAN, JOSEPH DURAN, IN POSITION NUMBER 5.

18         Q.   AND DID YOU HAVE MR. GARCIA THEN CIRCLE THAT

19    PARTICULAR PHOTOGRAPH AND INITIAL IT AND SIGN THE

20    ADMONISHMENT?

21         A.   YES, SIR.  I MAKE IT A PRACTICE.

22         Q.   DID YOU ALSO SIGN THAT PARTICULAR PHOTOGRAPHIC

23    LINE-UP?

24         A.   YES, SIR.

25         Q.   WHEN YOU -- PRIOR TO PRESENTING THIS

26    PHOTOGRAPHIC LINE-UP TO MR. GARCIA, DID YOU IN ANY WAY

27    ALERT HIM THAT MR. DURAN HAD BEEN ARRESTED IN THE 2000

28    JEEP THAT HAD BEEN TAKEN IN THE CARJACKING ON 1/11/04?

1        A.  NO, SIR.

2        Q.  AS FAR AS YOU KNOW, DID MR. GARCIA HAVE THAT

3    KNOWLEDGE?

4        A.  I HAVE NO IDEA, SIR.

5        MR. BHAYANI:  THANK YOU, YOUR HONOR.  NOTHING

6    FURTHER.

7        THE COURT:  CROSS.

8

9                     CROSS-EXAMINATION

10   BY MR. DURAN:

11       Q.  GOOD MORNING, MS. CORDERO.

12       A.  GOOD MORNING.

13       Q.  DO YOU STILL HAVE A PICTURE OF THE SIX-PACK

14   PHOTO LINE-UP IN FRONT OF YOU?

15       A.  I HAVE THE BLACK AND WHITE, YES, SIR.  NOT THE

16   EXHIBIT, BUT ONE THAT I BROUGHT FROM MY POLICE

17   DEPARTMENT.

18       Q.  YOU DON'T HAVE A COLOR ONE IN FRONT OF YOU?

19       A.  NO, SIR.

20       MR. DURAN:  WOULD I BE ABLE TO GIVE THE WITNESS THE

21   COLOR PHOTOS?

22       THE COURT:  YES, SIR.

23       MR. DURAN:  HERE YOU GO, MA'AM.

24       THE COURT:  AND THAT IS EXHIBIT NUMBER --

25       MR. DURAN:  9.

26       THE COURT:  -- 9; IS THAT CORRECT?

27       THE WITNESS:  CORRECT.

28   //

1    BY MR. DURAN:

2        Q.  WOULD YOU DESCRIBE THE HAIRSTYLE IN NUMBER 5,

3    PLEASE.

4        A.  SHORT, COMBED BACK.

5        Q.  WOULD YOU SAY WAVY?

6        A.  YES.

7        Q.  WOULD YOU SAY CURLY?

8        A.  IT LOOKS LIKE --

9        MR. BHAYANI:  YOUR HONOR, THE PHOTOGRAPH SPEAKS FOR

10   ITSELF.

11       THE COURT:  NO.  OBJECTION IS OVERRULED.

12       THE WITNESS:  IT LOOKS WAVY.

13   BY MR. DURAN:

14       Q.  LOOKS WAVY?  WOULD YOU SAY THE HAIR IS COLLAR

15   LENGTH?

16       A.  NO.  IT JUST HAS FROM THE EARS, IS ALL YOU COULD

17   SEE.  IT DOESN'T DEPICT THE BACK, SO I DON'T KNOW IF

18   THERE'S A PONYTAIL OR NOT.

19       MR. DURAN:  MAY I APPROACH, YOUR HONOR?

20       THE COURT:  YOU MAY.

21   BY MR. DURAN:

22       Q.  IF I COULD DRAW YOUR ATTENTION TO WHAT HAS

23   PREVIOUSLY BEEN MARKED AS PEOPLE'S EXHIBIT 4.  WOULD YOU

24   TAKE A LOOK AT NUMBER "C".

25       A.  OKAY.

26       Q.  AND WOULD YOU BE ABLE TO TELL FROM THAT PHOTO IF

27   THE HAIR IS, IN FACT, COLLAR LENGTH OR SHORT CLIPPED?

28       A.  IT'S SHORT COLLAR.  YEAH, IT'S SHORT.

1          Q.   WOULD IT BE YOUR EXPERIENCE AS -- INVESTIGATING

2     IDENTITIES AND COMPILING SIX-PACK PHOTO LINE-UPS, WOULD

3     YOU SAY THAT HAIR IS COLLAR LENGTH?

4          A.   IT'S COLLAR.  IT LOOKS LIKE IT'S UP TO THE NECK,

5     TO THE COLLAR, BUT IT'S SHORT.

6               BUT WHEN I DO SIX-PACKS I DON'T DO THIS ANGLE.

7     I GET THE FRONT END, WHICH IS WHAT'S ON HERE.

8          Q.   THANK YOU.

9               WOULD YOU SAY THE SUSPECT, ACCORDING TO THE SIX-

10    PACK PHOTO LINE-UP, THAT'S IN NUMBER 5 IS DARK COMPLECTED

11    OR LIGHT COMPLECTED?

12         MR. BHAYANI:  OBJECTION, YOUR HONOR, LACK OF

13    FOUNDATION.  ALSO, THIS PHOTOGRAPH SPEAKS FOR ITSELF.

14         THE COURT:  SUSTAINED.

15    BY MR. DURAN:

16         Q.   WOULD YOU BE ABLE TO EXPLAIN OR TELL THE COURT

17    WHAT COMPLEXION YOU SEE ON THE DEFENDANT NUMBER 5?

18         MR. BHAYANI:  SAME OBJECTION.

19         THE COURT:  SUSTAINED.

20              THE JURY IS GOING TO HAVE THE EXHIBIT, THE

21    EXHIBITS, IF ADMITTED, AND THEY WILL BE ABLE TO EXAMINE

22    THEM THEMSELVES, MR. DURAN.

23         MR. DURAN:  THANK YOU, YOUR HONOR.

24         Q.   DID YOU HAVE A DESCRIPTION OF THE SUSPECT --

25    STRIKE THAT.

26              WHEN YOU COMPILE THESE PHOTO LINE-UPS, DO YOU

27    TRY TO GET THE OTHER ANONYMOUS PEOPLE THAT YOU PUT IN

28    THERE AS CLOSE AS POSSIBLE TO THE DESCRIPTION THAT'S

1    GIVEN TO YOU OF THE SUSPECT OR OF THE PERSON YOU'RE

2    ACTUALLY INVESTIGATING?

3        A.  THE PICTURE THAT POPS UP IS WHAT I TRY TO MATCH

4    UP.  I DON'T KNOW WHO -- IF THAT'S THE PICTURE THAT'S

5    PROVIDED, THAT'S THE PICTURE I TRY TO MATCH UP WITH THE

6    PHOTO LINE-UP.

7            DID I ANSWER YOUR QUESTION?

8        Q.  YES, YOU DID.  YES, YOU DID.

9        A.  OKAY.

10       Q.  NOW, DOES THE INDIVIDUAL IN PHOTO 1 MATCH THE

11   DESCRIPTION OF NUMBER 5?

12       A.  SHORT HAIR, HISPANIC, MUSTACHE.  I WOULD SAY,

13   YES.

14       Q.  AND IN NUMBER 2, WOULD YOU SAY THE SAME THING?

15       A.  THOSE WERE THE BEST PICTURES I FOUND AT THE

16   TIME.  YES.

17       Q.  BUT DO THEY CLOSELY MATCH THE DESCRIPTION OF THE

18   PERSON IN NUMBER 5?

19       A.  HAS THE CHARACTERISTICS.  HAIR LAID BACK,

20   MUSTACHE, HISPANIC, BROWN EYES.  IT MATCHES.  SO YES.

21       Q.  AND SHORT HAIR?

22       A.  HE HAS HAIR COMBED BACK.

23       Q.  DOES HE HAVE SHORT HAIR?

24       A.  IT'S NOT LONG.

25       Q.  WOULD YOU SAY IT'S SHORT, THOUGH?

26       A.  I WOULD --

27       MR. BHAYANI:  THIS HAS BEEN ASKED AND ANSWERED,

28   JUDGE.

1          THE COURT:  NO.  OBJECTION IS OVERRULED.

2          THE WITNESS:  I WOULD CONSIDER IT AS SHORT HAIR.

3          MR. DURAN:  THANK YOU.

4          Q.  HOW ABOUT NUMBER 3?

5          A.  HISPANIC MALE, WAVY HAIR, COMBED BACK, LIGHT

6     MUSTACHE.  THAT'S WHAT?  3.

7          Q.  NUMBER 3 HAS WAVY HAIR?

8          A.  IT APPEARS TO BE WAVY, COMBED BACK.

9          Q.  NOT SHORT, SLICKED BACK?

10         A.  IT'S NOT SLICKED BACK.  IT'S COMBED BACK.

11         Q.  HOW ABOUT NUMBER 4?

12         A.  NUMBER 4 HAS SHORT HAIR, MUSTACHE.  HE DOES HAVE

13    HAIR ON HIS CHIN WHICH IS A LITTLE DIFFERENT, BUT THAT

14    WOULD BE NUMBER 4.  THAT'S WHO I SELECTED AS NUMBER 4.

15         Q.  AND FINALLY NUMBER 6.

16         A.  SHORT HAIR, MUSTACHE, HAIR ON THE CHIN, COMBED

17    BACK, HISPANIC.

18         Q.  THE FOLLOWING PAGE FROM THE SIX-PACK PHOTO

19    LINE-UP INCLUDES A -- IN THE COMMENTS SECTION THERE IS

20    SOME WRITING IN THERE.

21         A.  CORRECT.

22         Q.  WHOSE WRITING IS THAT?

23         A.  THAT WOULD BE MY WRITING.

24         Q.  AND YOU GOT THE INFORMATION -- I'M SORRY.

25             COULD YOU READ WHAT THAT SAYS.

26         A.  ABSOLUTELY.  I SAID, "GARCIA POINTED AT PICTURE

27    NUMBER 5 AND SAID, 'THIS ONE LOOKS LIKE HIM.  IT'S HIS

28    FACE, HIS HAIR AND HIS MUSTACHE.  THIS IS HIM.'"

1        Q.   DID MR. GARCIA INITIAL OR SIGN THAT PAGE THAT

2   YOU INDICATED?

3        A.   WE'VE NEVER HAD OUR VICTIM/WITNESS SIGN IT.  WE

4   FILL OUT THE INFORMATION IN FRONT OF THEM WHEN WE GIVE

5   THEM THE ADMONISHMENT.  THAT'S WHY WE HAVE THE DATE AND

6   TIME.

7        Q.   WHEN THEY PICK A PHOTO, THEY PUT A CIRCLE AROUND

8   IT?

9        A.   THAT'S NOT COMMON PRACTICE.  I DO IT BECAUSE,

10   YEARS LATER IN COURT, WHEN WE GO TO COURT, THEY MAY SAY,

11   "I DON'T REMEMBER IDENTIFYING ANYBODY."  THAT'S WHY I

12   HAVE THAT PRACTICE.  I HAVE THEM CIRCLE, SIGN IT,

13   INITIAL, AND LATER ON, IT DOES REFRESH THEIR MEMORY.

14        Q.   ON THE FOLLOWING STATEMENT, THE INFORMATION THAT

15   YOU WROTE ON THERE WAS FROM JOSE FERNANDO GARCIA?

16        A.   THAT IS CORRECT.

17        Q.   DO YOU HAVE THEM INITIAL, DATE OR SIGN THAT

18   ALSO, TO SHOW THAT THEY MADE THAT STATEMENT?

19        A.   NO, SIR.

20        Q.   WHY NOT?

21        A.   I'VE NEVER USED IT AS A PRACTICE.  THERE'S NO

22   ROOM ON THIS FORM FOR THEIR SIGNATURE.

23        MR. DURAN:  NOTHING FURTHER.

24        THE COURT:  REDIRECT?

25        MR. BHAYANI:  NO.  THANK YOU, YOUR HONOR.

26        THE COURT:  ANY REASON THIS WITNESS CANNOT BE

27   EXCUSED?

28        MR. BHAYANI:  NO.

1              JOSEPH ALFONSO DURAN,

2     CALLED AS A WITNESS IN AND ON HIS OWN BEHALF, HAVING BEEN

3     FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

4

5                   DIRECT EXAMINATION

6         MR. DURAN:  I CHOSE TO TESTIFY SO THAT YOU CAN HEAR

7     FROM ME PERSONALLY.  YOU'VE HEARD WHAT THE PEOPLE HAD TO

8     SAY AND WHAT THE WITNESSES HAD TO SAY.

9              JANUARY THE 11TH, I WAS ALLEGED TO BE AT MCCUNE

10    CHRYSLER, AND I ALLEGEDLY SHOWED MR. GARCIA MY ARM THAT

11    WAS THIN, AND I STATED THAT I HAD BEEN IN SOME KIND OF

12    ACCIDENT OR SOMETHING TO THAT EFFECT.

13        MR. BHAYANI:  OBJECTION, YOUR HONOR.  I'M GOING TO

14    OBJECT AS TO THIS NOT BEING A QUESTION-AND-ANSWER FORM.

15        THE COURT:  NO.  OBJECTION IS OVERRULED.

16        MR. DURAN:  YOU HEARD WHAT THE STORY WAS.  YOU HEARD

17    WHAT HAPPENED.

18             JANUARY THE 11TH, I WAS AT MY APARTMENT, AT MY

19    PLACE WHERE I LIVE AT, THE LAKESIDE HOTEL.

20             AS YOU CAN TELL FROM THE EVIDENCE, PEOPLE'S 4, I

21    HAVE A BUMP ON MY ARM.  IT WAS ACTUALLY A BROKEN ARM.

22    AND BECAUSE OF THAT FACT, I HAD TO HAVE AN OPERATION

23    DONE.  SCAR RIGHT HERE.

24             SO I WAS AT HOME WASHING MY CLOTHES.

25             I'VE NEVER BEEN TO MCCUNE CHRYSLER JEEP.

26    THERE'S ONLY ONE PERSON WHO SAYS I WAS AT MCCUNE CHRYSLER

27    JEEP, AND -- WELL, YOU'VE HEARD THE DIFFERENT STORIES

28    THAT HE'S GIVEN YOU.

1    JANUARY THE 12TH, I, IN FACT, WAS AT HOME. IT

2    WAS 9:30 IN THE EVENING TIME. MY CAR WAS OUT OF GAS.

3    THE NEIGHBORS ACROSS THE STREET, AS I STATED TO THE

4    POLICE OFFICERS WHEN I WAS ARRESTED, ALLOWED ME TO USE

5    THEIR VEHICLE. THEY GAVE ME THE KEY TO THE VEHICLE.

6        THERE WAS NO EVIDENCE OF TAMPERING WITH THE

7    VEHICLE, THE IGNITION. HAD TWO LICENSE PLATES ON IT.

8    AND THEY WERE MY NEIGHBORS. I LIVE ACROSS THE STREET. I

9    HAD NO REASON TO DOUBT THE TRUTH OF THE -- OR EVEN

10   CONSIDER THAT THE VEHICLE WOULD BE STOLEN.

11       I WENT TO WAL-MART, AS I STATED EARLIER. I MADE

12   A PURCHASE. THE OFFICER HELMS STATED THAT I DID HAVE A

13   PURCHASE IN MY VEHICLE, I DID HAVE A RECEIPT.

14       I DON'T FEEL I MADE A BAD CHOICE. I WAS THE

15   WRONG GUY. I WAS THE WRONG GUY IN THE WRONG PLACE. HAD

16   I BEEN THE ACTUAL CARJACKER, I'LL BE HONEST WITH YOU,

17   FOLKS, I WOULD NOT HAVE STOPPED. IF I KNEW THAT -- IF I

18   CARJACKED THAT CAR AND THE COPS PULLED ME OVER, I'M GOING

19   TO BE HONEST WITH YOU, I WOULD HAVE RAN. I WOULD HAVE

20   DROVE. I WOULD HAVE DID WHATEVER I COULD.

21       I DON'T WANT TO GO TO PRISON FOR CARJACKING.

22   THAT'S, LIKE, LIFE.

23     MR. BHAYANI: OBJECTION, YOUR HONOR. I'M GOING TO

24   MOVE TO --

25     THE COURT: SUSTAINED.

26       LADIES AND GENTLEMEN, YOU'RE ORDERED TO --

27   FIRST, THE QUESTION OF PENALTY OR PUNISHMENT IS A MATTER

28   THAT YOU ARE NOT TO CONSIDER IN ANY WAY IN ARRIVING AT

1    YOUR DECISION IN THIS CASE.

2          YOU MAY CONTINUE, SIR.

3    MR. DURAN:  I STOPPED AS ORDERED, GAVE MY FULL NAME

4    AS TRUE, GAVE MY BIRTH DATE AS TRUE, EXPLAINED MY

5    SHOPPING THAT -- MY SHOPPING.

6          I MADE A TRAFFIC VIOLATION, SO THE OFFICER

7    PULLED ME OVER.  HE SEARCHED MY DRIVER'S LICENSE TO MAKE

8    SURE THAT I WAS, IN FACT, A LICENSED DRIVER, AND IN SO

9    DOING, HE ALSO RAN A MAKE ON THE PLATE OF THE VEHICLE,

10   AND THE VEHICLE WAS CARJACKED.  I WAS IN IT.

11         I WANT YOU TO HEAR ME SAY IT:  I DIDN'T DO IT.

12   I DON'T WANT TO SIT THERE AS A QUIET -- AS A

13   NONPARTICIPANT PARTY.  I FEEL -- DOESN'T MATTER WHAT I

14   FEEL.

15         AND THAT'S ALL I CAN SAY.  NOTHING FURTHER.

16   THE COURT:  CROSS.

17   MR. BHAYANI:  YES, YOUR HONOR.  THANK YOU.

18

19                    CROSS-EXAMINATION

20   BY MR. BHAYANI:

21   Q.  WHAT IS THE NAME OF THIS NEIGHBOR WHERE YOU GOT

22   THIS CAR, MR. DURAN?

23   A.  THE NEIGHBOR LIVES ACROSS THE STREET.  IT'S JOHN

24   STAROS.

25   Q.  SPELL HIS LAST NAME.

26   A.  S-T-A-R-O-S.

27   Q.  WHAT IS HIS ADDRESS?

28   A.  I DON'T KNOW THE PHYSICAL NUMBER.  WE LIVE ON

1   SUSPENDED SENTENCE IS WHAT I UNDERSTAND, AND THAT AT SOME

2   LATER TIME THAT SUSPENSION WAS LIFTED AND HE WAS SENTENCED

3   SOME MONTHS LATER.

4       THE COURT:  OKAY.  THE DOCUMENT BEFORE, PAGE 74, IS THE

5   SUPERIOR COURT MINUTE ORDER FOR THE CASE THAT'S DATED MARCH

6   1, 1991.  AND IT DOES REFLECT WHAT YOU JUST SAID, THAT THERE

7   WAS A SENTENCE IMPOSED OF THE LOW TERM OF 16 MONTHS AND HE

8   WAS GIVEN THREE YEARS' PROBATION, ORDERED TO SPEND THE FIRST

9   365 DAYS IN THE CUSTODY OF THE SHERIFF.

10      THE DATE OF CONVICTION IS NOT THE DATE THAT HE WAS

11  SENTENCED TO PRISON.  SO, MR. BHAYANI, I DON'T UNDERSTAND

12  YOUR REQUEST TO CORRECT THE RECORD, BECAUSE THE DATE ON WHICH

13  HE WAS SENTENCED IS MARCH 1, 1991, AS REFLECTED IN THE MINUTE

14  ORDER OF THE COURT, YOUR BATES-STAMP NUMBER 74.

15      MR. BHAYANI:  THAT'S FINE, JUDGE.  THEN I WITHDRAW MY

16  REQUEST FOR CORRECTION.

17      THE COURT:  ANYTHING ELSE, GENTLEMEN?

18      MR. BHAYANI:  NO, YOUR HONOR.

19      MR. DALEY:  NO, YOUR HONOR.

20      THE COURT:  ALL RIGHT.  I THINK WE SHOULD ADDRESS THE

21  MOTION FOR NEW TRIAL FIRST, BECAUSE THAT HAS A BEARING AS TO

22  THE SECOND MATTER, WHICH IS SENTENCING.

23      AND LET ME RETURN YOUR TRANSCRIPT TO YOU, AS WELL,

24  MR. BHAYANI.

25      I WILL BE MORE THAN HAPPY TO HEAR FROM COUNSEL.  THIS

26  MATTER REGARDING THE MOTION FOR NEW TRIAL CENTERS AROUND A --

27  THIS CENTERS AROUND INFORMATION CONTAINED IN A POLICE REPORT

28  BY OFFICER CORDERO.

1    MR. DALEY POINTS OUT AND CONTENDS THAT THE PROSECUTION
2  FAILED TO COMPLY WITH PENAL CODE SECTION 1054.1 AND THAT IS
3  THE PRODUCTION OF ALL RELEVANT OR REAL EVIDENCE SEIZED OR
4  OBTAINED AS PART OF THE INVESTIGATION AND ANY EXCULPATORY
5  EVIDENCE.  AND HE CITES IN RE LITTLEFIELD -- WHO WAS THE
6  PUBLIC DEFENDER IN LOS ANGELES WHEN THIS CASE WAS DECIDED,
7  THAT'S WHY IT BEARS HIS NAME -- IN RE LITTLEFIELD, A 1993
8  DECISION, 5 CAL. 4TH 122, AND PEOPLE VERSUS LITTLE, A 1997
9  DECISION, AT 50 CAL. APP. 4TH 426.
10    AT PAGE 2 OF HIS SUPPLEMENTAL POINTS AND AUTHORITIES,
11  MOTION FOR NEW TRIAL, HE ATTACHES THE DECLARATION OF A
12  PRIVATE INVESTIGATOR, FRANK GRIFFIN.  AND THAT DECLARATION BY
13  MR. GRIFFIN STATES THAT SERGEANT CORDERO OF THE NATIONAL CITY
14  POLICE DEPARTMENT PREPARED THE WRITTEN REPORTS REGARDING THE
15  WITNESSES ON OR ABOUT SEPTEMBER 29, 2004, FURTHER, THAT THE
16  REPORTS WOULD HAVE BEEN PROVIDED THE DISTRICT ATTORNEY'S
17  OFFICE SHORTLY AFTER THE PREPARATION AND WELL IN ADVANCE OF
18  THE TRIAL WHICH BEGAN ON JANUARY 24TH, 2005.
19    HOWEVER, IN LOOKING AT THE DECLARATION, SERGEANT CORDERO
20  STATES THAT THERE'S NO WAY TO KNOW THE EXACT DATE BUT THAT IT
21  WOULD HAVE BEEN SHORTLY AFTER THE DATE THAT THE REPORT
22  DOCUMENTED AT THE BOTTOM, WHICH SAID THE REPORT WAS FOR
23  SEPTEMBER 24, 2004.
24    NOW, THE REASON THAT I START WITH THAT IS BECAUSE, IN
25  MR. BHAYANI'S RESPONSE, THIS IS HIS PLEADING TITLED "POINTS
26  AND AUTHORITIES IN OPPOSITION TO MOTION FOR A NEW TRIAL
27  PURSUANT TO PENAL CODE SECTION 1181," THIS IS AT PAGE 5, LINE
28  12, HE WRITES, QUOTE:

1      FIRST, THE EVIDENCE THAT THE DEFENDANT CLAIMED IS

2  NEWLY DISCOVERED IS NOT.  THE EVIDENCE AT ISSUE IN THIS

3  CASE IS OFFICER CORDERO'S POLICE REPORT.  A COPY OF THAT

4  REPORT WAS GIVEN TO THE PEOPLE THE MORNING OF FEBRUARY

5  3, 2005, THE SECOND TO THE LAST DAY OF TRIAL.  THE

6  PEOPLE PROMPTLY TURNED OVER A COPY OF THAT REPORT TO THE

7  DEFENDANT.

8      AT THE TIME DEFENDANT RECEIVED THE REPORT, HE MADE

9  A MOTION TO EXCLUDE THIS REPORT FROM EVIDENCE,

10  REPORTER'S TRANSCRIPT 305, LINES 3-28.  END QUOTE.

11      HERE WE HAVE THE OFFICER SAYING THAT HE PREPARED THE

12  REPORT AND THAT IT WOULD HAVE BEEN PROVIDED, WHICH IS

13  DIFFERENT THAN IT WAS PROVIDED.  I INTERPRET THAT TO MEAN HE

14  IS SAYING WHAT NORMALLY HAPPENS AS OPPOSED TO WHAT DID

15  HAPPEN.  WHEREAS, MR. BHAYANI'S PLEADINGS SETS OUT

16  SPECIFICALLY THAT THE PROSECUTION DID NOT RECEIVE THE REPORT

17  UNTIL THE MORNING OF FEBRUARY 3RD, 2005.

18      SO LET'S START WITH THAT AND THEN THE ISSUE, AS

19  MR. BHAYANI SAYS, THAT THIS IS NOT NEWLY-DISCOVERED EVIDENCE,

20  BECAUSE AT PAGE 5, AT LINE 16, HE GOES ON TO SAY:  BASED ON

21  HIS OWN STATEMENT -- QUOTE:  BASED ON HIS OWN STATEMENT ON

22  THE RECORD, DEFENDANT ACKNOWLEDGED THAT HE RECEIVED A COPY OF

23  THE REPORT DURING THE TRIAL.  THE DEFENDANT ALSO INQUIRED

24  WHETHER THE TWO WITNESSES, MS. ROBINSON AND MR. OCHOA,

25  IDENTIFIED IN THE REPORTS WOULD BE CALLED AS WITNESSES BY THE

26  PEOPLE, REPORTER'S TRANSCRIPT 308, LINES 13 THROUGH 24.  THIS

27  INDICATES THAT DEFENDANT FULLY REVIEWED THE REPORTS AND

28  REFUTES HIS CLAIM THAT HE DID NOT DISCOVER THESE WITNESSES

1    UNTIL AFTER THE TRIAL.  END QUOTE.

2         SO THOSE ARE THE TWO POINTS THAT THE COURT WOULD LIKE TO

3    HEAR FROM COUNSEL ON AND THEN ANY ADDITIONAL THAT YOU WISH TO

4    BRING TO THE COURT'S ATTENTION.

5         MR. BHAYANI:  JUDGE, IF I MAY, I WOULD LIKE TO REFER TO

6    MR. DALEY'S NOTICE OF MOTION, MOTION FOR NEW TRIAL, PURSUANT

7    TO PENAL CODE SECTION 1181.

8         THE COURT:  OKAY.

9         MR. BHAYANI:  IF YOU LOOK AT THE ATTACHMENT OF SERGEANT

10   CORDERO'S REPORT, AND I'M REFERRING TO THE THREE-PAGE REPORT,

11   WHAT IS CONSISTENT WITH MY --

12        THE COURT:  HOLD ON.  I'VE GOT THE PLEADINGS.  LET ME

13   FIND IT SO WE'RE ON THE SAME PAGE.  I HAVE WHAT SAYS

14   "DETECTIVE'S FOLLOW-UP REPORT."  IS THAT THE ONE YOU'RE

15   REFERRING TO?

16        MR. BHAYANI:  YES.

17        THE COURT:  OKAY.

18        MR. BHAYANI:  WHAT IS CONSISTENT WITH MY REPRESENTATION

19   AND WHAT THE COURT HAS ALREADY TALKED ABOUT ON THE RECORD IS

20   THAT ALL OF MY DISCOVERY WAS BATES STAMPED.  IF YOU LOOK AT

21   THE BOTTOM OF THAT PAGE -- OR OFFICER CORDERO'S FIRST THREE

22   PAGES, IT'S NOT BATES STAMPED.

23        THE COURT:  OKAY.

24        MR. BHAYANI:  THE VERY LAST REPORT, WHERE IT SAYS,

25   "PHOTO LINEUP," IT'S BATES STAMPED 17.

26        THE COURT:  YES.

27        MR. BHAYANI:  IF YOU LOOK OFFICER GIESE'S REPORT ENDS AT

28   PAGE 16.

1    WHEN I RECEIVED THIS COPY OF THE REPORT ON FEBRUARY 3,

2    2005, I DID NOT EVEN HAVE TIME TO BATES STAMP IT CONSISTENT

3    WITH THE REST OF THE DISCOVERY.  I IMMEDIATELY MADE A COPY OF

4    IT AND PROVIDED IT TO MR. DURAN, WHO READ IT ONTO THE RECORD

5    JUST AS I PROVIDED IT TO HIM ON THAT DATE.  THAT IS ALSO

6    CONSISTENT WITH MY POSITION THAT I DID NOT RECEIVE THIS

7    REPORT UNTIL FEBRUARY 3 FROM SERGEANT CORDERO WHEN I WAS

8    DISCUSSING PAGE 17 WITH HER.

9    SO THE REST OF MY CONTENTION IS ALREADY IN MY PAPERS.  I

10   DON'T WANT TO REPEAT IT, BUT I JUST WANTED TO POINT THIS OUT

11   SO THAT, YOU KNOW, EVERYBODY KNOWS THAT THAT'S CONSISTENT

12   WITH MY POSITION.

13   THE COURT:  ALL RIGHT.

14   MR. DALEY.

15   MR. DALEY:  THANK YOUR HONOR.

16   STARTING WITH THE FIRST THING THE COURT RAISED AS AN

17   ISSUE TO ADDRESS, I DID IN MY SUPPLEMENTAL ALSO POINT OUT THE

18   FACT THAT THE PEOPLE HAVE AN OBLIGATION TO PROVIDE THIS IN

19   THE BROADER SENSE.  AND I POINT TO THE FACT THAT, IN ANY

20   EVENT, THE PROSECUTOR'S PRESUMED TO HAVE KNOWLEDGE OF ALL

21   INFORMATION GATHERED BY THE INVESTIGATING AGENCY; THAT'S THE

22   CASE OF OF IN RE BROWN, A 1998 CASE, AT 17 CAL. 4TH 873.

23   ESSENTIALLY, AS I READ IT, THE PEOPLE CANNOT HIDE BEHIND

24   OR BASE THEIR CONTENTION THAT "WE DIDN'T HAVE IT" AS A BASIS

25   OF DENYING WHAT OTHERWISE WOULD BE RELEVANT EVIDENCE TO THE

26   DEFENSE.  THIS IS SOMETHING THAT CLEARLY BY ALL INDICATIONS

27   THE NATIONAL CITY POLICE HAD PREPARED.

28   THERE ARE SOME ISSUES WITH REGARD TO THE FACT THAT THE

1    REPORT, WHICH SPEAKS FOR ITSELF, POINTS OUT THAT THIS

2    INFORMATION WAS ACTUALLY GATHERED BACK IN JANUARY OF 2004.

3    THESE ARE EYEWITNESSES WHO WERE INTERVIEWED BACK AT THE TIME

4    OF THE INCIDENT AND THAT FOR WHATEVER REASON THE REPORT

5    ITSELF BY ALL INDICATIONS WASN'T GENERATED UNTIL SEPTEMBER OF

6    2004.

7         THERE WERE TWO KEY WITNESSES IN THAT THAT WERE

8    PRESENTED.  THOSE TWO KEY WITNESSES WERE AT THE CAR SALES

9    LOT, ACTUALLY SAW THE SUSPECT, GAVE IDENTIFICATIONS OF THE

10   SUSPECT, AND THIS WAS INFORMATION THAT ACCORDING TO

11   OFFICER -- OR SERGEANT CORDERO'S REPORT WAS RELAYED AT THE

12   TIME OF THE INITIAL INVESTIGATION.

13        THE REPORT ITSELF, BY ALL INDICATIONS, DIDN'T OCCUR

14   UNTIL SEPTEMBER.  AND IT IS ALSO CLEAR THAT THEIR COMMON

15   PRACTICE WOULD BE TO TURN THAT OVER TO THE PEOPLE SHORTLY

16   AFTER THE PREPARATION OF THE REPORT IN THE END OF

17   SEPTEMBER.

18        NOW, THE FACT OF A BATES STAMP IN AND OF ITSELF MY

19   ARGUMENT TO THE COURT WOULD BE DOESN'T REALLY CLARIFY THAT AT

20   ALL.  AS I UNDERSTAND, BATES-STAMPING REALLY IS A PART OF THE

21   PROCESS OF TURNING OVER DISCOVERY.  WHETHER OR NOT THE PEOPLE

22   BATES STAMP EVERY PIECE OF DISCOVERY OR EVERY PIECE OF

23   INFORMATION THAT COMES INTO THEIR FILE, I WOULD SUBMIT IS

24   PROBABLY NOT THE CASE.  YOU KNOW, EACH DEPUTY DISTRICT

25   ATTORNEY MIGHT DO IT DIFFERENTLY.  THEY MIGHT DO IT

26   DIFFERENTLY IN EVERY CASE.

27        BUT THE FACT IS THAT THE BATES-STAMPING AS TO SOMETHING

28   THAT WAS TURNED OVER AND THE SEQUENCING OF THAT DOESN'T

1  EXPLAIN THE FACT THERE'S A GAP BETWEEN SEPTEMBER AND JANUARY

2  AS TO WHERE THIS REPORT WAS.  WHETHER IT WAS SITTING IN THE

3  PEOPLE'S FILES SOMEWHERE OR SOMEWHERE ON A DESK SOMEWHERE

4  DOESN'T EXONERATE THE FACT THAT THE PROSECUTION AND, IN THE

5  BROADER SENSE, THE INVESTIGATING AGENCY AS PART OF THAT

6  PROSECUTION HAS AN OBLIGATION TO PROVIDE THAT RELEVANT

7  EVIDENCE TO THE DEFENSE AS PART OF 1054 AND AS WELL AS THE

8  RIGHTS OF DUE PROCESS, I WOULD SUBMIT, UNDER THE

9  CONSTITUTION.

10      THIS WAS KEY EVIDENCE.  THIS IS AN EYEWITNESS CASE.  IT

11  BOILED DOWN, AS I READ THE TRANSCRIPT -- AND, AGAIN, I WASN'T

12  PART OF THE TRIAL, BUT MY REVIEW OF THE TRANSCRIPT

13  DEMONSTRATED THAT THE KEY WITNESS IS THE VICTIM WHO MADE THIS

14  IDENTIFICATION.  THERE WAS ARGUMENTS MADE BY MR. DURAN WITH

15  REGARD TO THAT IDENTIFICATION ISSUE.

16      HE WAS PRESENTED WITH THIS PIECE OF INFORMATION AT THE

17  END OF THE TRIAL, A THREE-PAGE REPORT.  THE FIRST PART OF THE

18  REPORT IS WHAT HE OBVIOUSLY KEYED ON, WHICH HAD TO DO WITH A

19  PHOTO LINEUP.  AND HIS CONCERNS AND THE COURT'S GOING THROUGH

20  THE SITUATION WITH HIM AT HIS REQUEST ABOUT WHETHER OR NOT

21  THIS WAS GOING TO BE ADMISSIBLE, AND HE WAS FOCUSING ON THE

22  FACT THAT WHETHER OR NOT THIS REPORT AND THE FIRST PAGE OF

23  THAT REPORT THAT HE REVIEWED WAS SOMETHING THAT WAS GOING TO

24  COME IN AS PART OF A PHOTO LINEUP ISSUE THAT HE WAS CONCERNED

25  WITH.

26      WHAT HE -- IN REVIEWING IT SUBSEQUENT TO THAT -- AND,

27  AGAIN, ANYONE, WHETHER IT'S AN ATTORNEY OR AN IN PRO PER

28  DEFENDANT, IS GOING TO HAVE IN THE MIDST OF A TRIAL, IN THE

1    LAST THROES OF A TRIAL, THE LAST DAY, EFFECTIVELY, OF A

2    TRIAL, IS CONCERNED WITH ISSUES THAT HAVE BEEN PREPARED FOR

3    OVER A PERIOD OF TIME.  THIS IS A CASE THAT HAD BEEN PENDING

4    FOR MONTHS, AND HERE IT IS THE LAST DAY OF TRIAL AND THIS

5    INFORMATION IS GIVEN TO HIM WITH THESE TWO WITNESSES NAMED IN

6    THAT THREE-PAGE DOCUMENT.

7    WHEN HE LOOKED AT IT, HE LOOKED AT IT IN MY OPINION IN

8    AN INCORRECT WAY.  HE LOOKED AT IT FROM THE STANDPOINT OF A

9    PHOTO LINEUP AS OPPOSED TO THE FACT THAT THESE KEY WITNESSES,

10   TWO EYEWITNESSES TO THE SUSPECT, GAVE VARYING DESCRIPTIONS OF

11   THE PERSON.

12   HIS ARGUMENT AT THE CLOSE OF HIS TRIAL WAS, IN EFFECT,

13   POINTING OUT THE DISCREPANCIES IN EYEWITNESS IDENTIFICATION.

14   BUT CERTAINLY, IN WEIGHING THAT ON THE PART OF THE JURY,

15   GETTING INFORMATION OF PEOPLE WHO GIVE VARYING DESCRIPTIONS

16   OF THE SUSPECT WOULD HAVE WEIGHED, I SUBMIT, ON THE ISSUE OF

17   PROOF BEYOND A REASONABLE DOUBT WITH REGARD TO

18   IDENTIFICATION.

19   IN FACT, WHEN I REVIEWED IT, THERE WAS A QUESTION ABOUT

20   THAT RAISED BY THE JURY TO SOME EXTENT IN THEIR JURY

21   DELIBERATIONS, AT LEAST IN ONE OF THE QUESTIONS THAT I

22   READ.

23   SO I WOULD SUBMIT THAT IT IS OBVIOUSLY RELEVANT,

24   OBVIOUSLY VERY SIGNIFICANT AND THAT THAT INFORMATION ALSO LED

25   TO A THIRD WITNESS, WHO WAS NOT MENTIONED IN THE REPORT, WHO

26   WAS ALSO AN EYEWITNESS, MR. MORENO, WHO WAS HANDED OFF BY ONE

27   OF THE SALES AGENTS -- OR THE SUSPECT WAS HANDED OFF TO

28   MR. MORENO, WHO HAD EVEN MORE OF AN EYEWITNESS CONTACT WITH

THAT PERSON.  THAT WAS NOT PART OF THE REPORT BUT WAS LED TO

BY VIRTUE OF AN INVESTIGATOR IMMEDIATELY AFTER THE TRIAL

BEING POINTED TO BY MR. DURAN TO ASK TO INTERVIEW THAT

INDIVIDUAL.  AND THAT LED TO THAT THIRD INDIVIDUAL WHO WAS AN

EYEWITNESS, WHO WAS INTERVIEWED AND ALSO GAVE AN INDICATION

ABOUT HIS ABILITY TO IDENTIFY THE INDIVIDUAL.

ALL THIS HAPPENED, I WOULD SUBMIT, AT THE END OF A TRIAL

WHEN HE REALLY DIDN'T HAVE AN OPPORTUNITY TO REVIEW IT.  IT

SHOULD HAVE BEEN PRESENTED BACK IN JANUARY IN REALITY; A

REPORT, THOUGH, WASN'T GENERATED UNTIL SEPTEMBER OF 2004.

THIS WAS NEW EVIDENCE.  CERTAINLY, THE NEW THIRD

INDIVIDUAL WAS NEW EVIDENCE THAT HE HAD NOT HAD AT ALL BEFORE

THAT.  AND EVEN THE TWO THAT HE HAD, I WOULD SUBMIT, WERE

GIVEN SUCH -- AT THE END OF THIS WHOLE TRIAL SITUATION SUCH

THAT HE DIDN'T HAVE A CHANCE TO DIGEST AND CONSIDER THAT

INFORMATION THAT WAS COMING TO HIM IN THE LAST SECONDS OF THE

TRIAL.

SO I WOULD SUBMIT THAT THERE IS NO JUSTIFICATION FOR THE

DELAYED RECEIPT OF THIS INFORMATION.  AND IN ADDITION TO

THAT, THAT FAILURE TO PROVIDE THAT IN A TIMELY FASHION DENIED

HIS RIGHTS IN TERMS OF A FAIR TRIAL IN THIS PROCESS AND I ASK

OUR MOTION AT THIS TIME BE GRANTED FOR A NEW TRIAL.

MR. BHAYANI:  JUDGE, THE PEOPLE DO HAVE AN OBLIGATION

UNDER PENAL CODE SECTION 1054 TO TURN OVER ALL RELEVANT

EVIDENCE.  I CONCUR WITH COUNSEL'S REPRESENTATION REGARDING

THAT.  HOWEVER, EVEN IF THIS REPORT WAS NOT TURNED OVER, IT

IS THE PEOPLE'S POSITION THAT WOULD NOT BE ERROR.  THE REASON

IS IT DOES NOT FIT THE BRADY REQUIREMENTS OF ANY EXCULPATORY

1    INFORMATION. IF ANYTHING, IF YOU LOOK AT THE REPORT ITSELF,

2    PAGE 1 OF 3 OF SERGEANT CORDERO'S REPORT, THAT INFORMATION IS

3    ENTIRELY CUMULATIVE BECAUSE THIS INFORMATION HAS BEEN

4    INCLUDED IN OFFICER GIESE'S REPORT.  IF YOU LOOK AT PAGE 2 OF

5    3, THAT IS THE NEW INFORMATION AS TO MS. ROBINSON'S AND

6    MR. OCHOA'S STATEMENTS.

7        NOW, IF YOU LOOK AT MS. ROBINSON'S REPORT, SHE DESCRIBES

8    THE PERSON THAT HAD COME OVER TO HER, INTERACTED WITH HER

9    REGARDING A POTENTIAL SALE OF A USED JEEP.  SHE DESCRIBES HIM

10   AS A HISPANIC MALE ADULT, BETWEEN 25 AND 30 YEARS OLD, WITH

11   SHORT BLACK HAIR AND A POCKED FACE.  THAT'S A VERY

12   DISTINCTIVE DESCRIPTION WHICH ENTIRELY FITS MR. DURAN.  IF

13   ANYTHING, THAT HURTS HIM.  THAT INFORMATION DOES NOT IN ANY

14   WAY HELP HIM OR IS NOT EXCULPATORY.

15       SHE ALSO THEN GOES ON TO SAY THAT SHE COULD NOT MAKE AN

16   IDENTIFICATION BECAUSE HER INTERACTION WITH THAT PERSON WAS

17   VERY, VERY BRIEF AND LIMITED.

18       IF YOU LOOK AT MR. OCHOA'S DESCRIPTION ON THE SECOND

19   PARAGRAPH OF HIS STATEMENT, HE DESCRIBES THE PERSON AS A

20   HISPANIC MALE ADULT, ABOUT 30 YEARS OLD, WITH BLACK HAIR AND

21   A MUSTACHE, WEARING SUNGLASSES, A BLUE T-SHIRT, TAN JACKET,

22   DARK PANTS.  THAT'S CONSISTENT WITH WHAT JOSE GARCIA, THE

23   VICTIM IN THIS CASE, HAD IDENTIFIED THE PERSON.

24       HE ALSO INDICATES THAT HE COULD NOT IDENTIFY THE SUSPECT

25   IF SEEN AGAIN.  I DON'T KNOW HOW THIS FITS THE MCDANIEL

26   REQUIREMENTS, WHICH IS THE BASIS FOR THE NEW TRIAL.

27       SO WHEN MR. DALEY SAYS THIS INFORMATION THEN LED TO A

28   THIRD PERSON, AND HE REFERRED TO HIM AS MR. MORENO, I DON'T

SEE MR. MORENO ANYWHERE IN HIS PLEADINGS.  IF ANYTHING, I SEE

JOSE MORALES IN HIS PLEADINGS.  SO I DON'T KNOW WHO THIS

MR. MORENO IS.  SO PERHAPS HE MISSPOKE, BUT HIS PLEADINGS

INDICATE THAT THERE WAS ANOTHER SALES PERSON BY THE NAME OF

MORALES.  BUT WE DON'T KNOW WHAT MORALES IS GOING TO BE

SAYING BECAUSE THERE'S NO STATEMENT ATTACHED TO HIS PLEADINGS

REGARDING MR. MORALES.

SO, AS MY PAPERS CLEARLY INDICATE, JUDGE, THE ONLY PIECE

OF PAPER THAT WAS NOT TURNED OVER IS SERGEANT CORDERO'S PAGE

2 THAT'S OF ANY SIGNIFICANCE BECAUSE PAGE 3 IS VIRTUALLY

BLANK.  PAGE 2 OF 3 IS THE ONLY INFORMATION THAT WAS PROVIDED

TO MR. DURAN IN THE MIDDLE OF THE TRIAL.

HE WAS VOCIFEROUS WITH THIS COURT IN MAKING A MOTION TO

EXCLUDE THIS REPORT.  YOU KNOW THAT HE REVIEWED THE REPORT

BECAUSE HE MENTIONS THE NAMES THAT WERE IN THIS REPORT THAT

WERE NOT ANYWHERE ELSE IN THE DISCOVERY.  AND HE INQUIRED

WHETHER WE WERE GOING TO CALL THEM OR NOT.

MR. GRIFFIN, WHO WAS HIS INVESTIGATOR, WAS EITHER

OUTSIDE DURING MOST OF THE TRIAL OR HE WAS SEATED HERE IN THE

COURTROOM.  SO IT WASN'T AS IF HE DIDN'T HAVE ACCESS TO

MR. GRIFFIN, THE INVESTIGATOR.  HE COULD HAVE IMMEDIATELY

SAID:  I NEED TO SPEAK AND FOLLOW UP WITH THESE TWO PEOPLE,

AND I'M SURE THE COURT WOULD HAVE GRANTED HIM A SHORT

CONTINUANCE TO DO THAT HAD HE MADE THE PROPER REQUIREMENTS

FOR A SHORT CONTINUANCE.

SO I DON'T BELIEVE THIS FITS THE REQUIREMENTS OF A

MOTION FOR A NEW TRIAL, JUDGE.

MR. DALEY:  YOUR HONOR, JUST BRIEFLY, I DID MISSPEAK.

1    IT WAS MR. JOSE MORALES.  AND I DID HAVE ATTACHED TO MY

2    MOVING PAPERS A DECLARATION OF MR. GRIFFIN OUTLINING THE FACT

3    THAT MS. ROBINSON, WHO HE SPOKE WITH BACK ON FEBRUARY 11,

4    2005, POINTING OUT SOME DISCREPANCIES AGAIN, THE AGE OF THE

5    INDIVIDUAL AS 23 TO 24, GRAYING HAIR, THE HAIR WAS SLICKED

6    BACK, CURLY, MEDIUM COMPLEXION, NO SUNGLASSES, EYES BROWN AND

7    A LITTLE BEADY.

8        THESE WERE THINGS WHICH WERE REFLECTED, ALSO, IN THE

9    INVESTIGATIVE REPORT OF SERGEANT CORDERO BACK WHEN SHE DID

10   THE INITIAL INTERVIEW, AS WELL.  SO IT'S SOMEWHAT CONSISTENT

11   WITH THE FACT THAT MS. ROBINSON HAD CONTACT WITH THE SUSPECT,

12   GAVE A DESCRIPTION.  THAT DESCRIPTION WAS GIVEN TO

13   MR. GRIFFIN.  IT SEEMED TO BE SOMEWHAT CONSISTENT WITH WHAT

14   SHE TOLD SERGEANT CORDERO BACK IN JANUARY OF 2004.

15       SHE THEN, THOUGH, POINTED OUT THERE WAS A SALESMAN, JOSE

16   MORALES, WHO WAS THERE AND SHE REFERRED THE INDIVIDUAL TO

17   MR. MORALES.  AND THAT WASN'T MENTIONED IN ANY OF THE

18   REPORTS, INCLUDING THE SERGEANT CODERO REPORT.

19       AND IN CONTACTING MR. MORALES, MR. GRIFFIN FOUND THAT,

20   YES, HE CONFIRMED THAT THIS SUSPECT HISPANIC MALE WAS

21   REFERRED TO HIM BY MS. ROBINSON ON THE DATE OF THE INCIDENT.

22   HIS DESCRIPTION WAS A 20 TO 21 YEARS OF AGE SKINNY PERSON.

23   HE DIDN'T THINK HE HAD ANY SUNGLASSES.  HIS ESTIMATE OF

24   HEIGHT WAS FIVE-FOOT-SIX TO FIVE-FOOT-SEVEN, HISPANIC.  HE

25   SPOKE ONLY IN ENGLISH, NO ACCENT.  HAD A JACKET DRAPED OVER

26   AN ARM.  NO MENTION OF HIS HEALTH AS BEING ANYTHING THAT HE

27   NOTICED AT THE TIME.  HE HAD LIGHT BROWN HAIR WHICH WAS A

28   LITTLE MESSY.  HE SAID THE POLICE NEVER INTERVIEWED HIM, AND

1    HE STILL FELT THAT HE COULD IDENTIFY THE INDIVIDUAL.

2    NOW, THIS INDIVIDUAL HAS BEEN HARD TO GET HOLD OF

3    BECAUSE OF THE FACT THAT HE HAS GONE ACROSS THE BORDER, AND

4    TRYING TO TRACK THIS INDIVIDUAL DOWN FOR FOLLOW-UP HAS BEEN

5    DIFFICULT AT BEST.  WE DO HAVE SOME DECLARATIONS, THOUGH,

6    FROM AT LEAST ONE OF THE OTHER INDIVIDUALS WHO HAD BEEN

7    CONTACTED BY SERGEANT CORDERO THAT I ATTACHED.

8    AND I WOULD SUBMIT THAT, AGAIN, MR. DURAN'S MISREAD OF

9    THIS WHEN HE GOT IT AT THE LAST MINUTE SHOULDN'T, IN MY

10   ESTIMATION, BE HELD AGAINST MR. DURAN.  I WOULD SUBMIT IT'S

11   THE PEOPLE'S OBLIGATION TO GET THIS MATERIAL TO -- WHETHER A

12   PERSON IS REPRESENTED OR UNREPRESENTED, WELL IN ADVANCE OF A

13   TRIAL.  AND HAD AN ATTORNEY, PERHAPS, FAILED TO HAVE SAID:

14   LOOK, I'M GETTING THIS AT THE LAST MINUTE, I NEED A

15   CONTINUANCE, THERE WOULD BE NO DOUBT IN MY MIND THAT THE

16   INEFFECTIVE ASSISTANCE OF COUNSEL ISSUE WOULD HAVE BEEN

17   RAISED TO THE EFFECT OF SAYING THAT THIS SHOULD BE RETRIED.

18   AND THE FACT THAT THE COUNSEL GOT IT AT THE LAST MINUTE

19   MAY BE SOMETHING THAT SHOULD BE WEIGHED INTO THIS PROCESS.

20   WHEN THE PROSECUTION HAS THAT OBLIGATION AND BURDEN TO COME

21   FORWARD -- AND THIS ISN'T SOMETHING THAT JUST EVOLVED AND WAS

22   A LAST-MINUTE REPORT THAT THE POLICE WERE GENERATING.  THIS

23   IS A REPORT THAT THEY TOOK AND THE INFORMATION THEY TOOK AT

24   THE TIME OF THE INCIDENT IN JANUARY OR THEREABOUTS OF 2004

25   AND THEN DIDN'T GET A WRITTEN REPORT TOGETHER UNTIL SEPTEMBER

26   OF 2004.  BUT THERE IS NO JUSTIFICATION AND NO EXCUSE, I

27   WOULD SUBMIT, TO THE FACT THAT THIS IS BEING PRESENTED TO THE

28   DEFENSE THE LAST DAY EFFECTIVELY OF TRIAL, RIGHT BEFORE

1  CLOSING, RIGHT BEFORE THIS MATTER WAS TO COMMENCE WITH JURY

2  INSTRUCTION.

3      AND HAD MR. DURAN HAD IT IN ADVANCE, HE CLEARLY WOULD

4  HAVE BEEN ABLE TO ACT ON IT, TO GET THIS ADDITIONAL

5  INFORMATION IN FRONT OF THE JURY, WHICH WOULD BE

6  DISCREPANCIES, THINGS TO POINT TO, AND INCONSISTENCIES OF

7  EYEWITNESSES WHO GAVE VARYING DESCRIPTIONS OF THIS INDIVIDUAL

8  AND, I WOULD SUBMIT, WOULD RAISE ON THE ONLY ISSUE, AN I.D.

9  ISSUE PRINCIPALLY BY ONE WITNESS, SOME REAL QUESTION WITH

10  REGARD TO THAT EYEWITNESS IDENTIFICATION.

11      SO, AGAIN, I WOULD URGE THE COURT TO GRANT THE MOTION

12  FOR A NEW TRIAL.

13      THE COURT:  ON A MOTION FOR NEW TRIAL, THE TRIAL COURT

14  MUST REVIEW THE EVIDENCE INDEPENDENTLY, CONSIDERING THE

15  PROPER WEIGHT TO BE AFFORDED TO THE EVIDENCE, AND THEN DECIDE

16  WHETHER THERE IS SUFFICIENT CREDIBLE EVIDENCE TO SUPPORT THE

17  VERDICT.  THIS IS FROM THE CASE OF PEOPLE VERSUS DAVIS AT 10

18  CAL. 4TH, 463 AT PAGE 524.

19      PENAL CODE SECTION 1181(A) PROVIDES THAT WHEN NEW

20  EVIDENCE IS DISCOVERED MATERIAL TO THE DEFENDANT AND WHICH HE

21  WOULD NOT WITH REASONABLE DILIGENCE HAVE DISCOVERED AND

22  PRODUCED AT TRIAL, WHEN A MOTION FOR NEW TRIAL IS MADE UPON

23  THE GROUND OF NEWLY-DISCOVERED EVIDENCE, THE DEFENDANT MUST

24  PRODUCE AT THE HEARING IN SUPPORT THEREOF AN AFFIDAVIT OF THE

25  WITNESS BY WHOM SUCH EVIDENCE IS EXPECTED TO BE GIVEN AND, IF

26  TIME IS REQUIRED BY THE DEFENDANT TO PROCURE SUCH AFFIDAVIT,

27  THE COURT MAY POSTPONE THE HEARING FOR THE MOTION FOR SUCH

28  LENGTH OF TIME AS ALL OTHER CIRCUMSTANCES OF THE CASE MAY

1    SEEM REASONABLE.

2         THE PROVISIONS FOR A MOTION FOR NEW TRIAL BASED UPON

3    NEWLY-DISCOVERED EVIDENCE, THE DEFENDANT HAS THE BURDEN OF

4    SHOWING THAT THE EVIDENCE IS, IN FACT, NEWLY DISCOVERED, THAT

5    THE EVIDENCE IS NOT CUMULATIVE OR OTHERWISE BEARING ON THE

6    SAME ISSUE, THAT THE EVIDENCE IS LIKELY TO RESULT IN A

7    DIFFERENT VERDICT ON A RETRIAL AND THE EVIDENCE COULD NOT

8    WITH REASONABLE DILIGENCE HAVE BEEN DISCOVERED OR PRODUCED AT

9    THE TRIAL OR, IF THE REASONABLE DILIGENCE WAS NOT USED BY

10   COUNSEL, THAT THE NEWLY-DISCOVERED EVIDENCE WOULD PROBABLY

11   LEAD TO A DIFFERENT RESULT ON RETRIAL.

12        I'D LIKE TO TALK ABOUT WHETHER A DIFFERENT RESULT IS

13   PROBABLE, BECAUSE I BELIEVE THAT IS THE MATTER UPON WHICH THE

14   DECISION OF THE COURT TURNS.  SO LET'S FOR PURPOSES OF OUR

15   DISCUSSION ASSUME THIS IS NEWLY-DISCOVERED EVIDENCE, AND I'M

16   NOT RULING THAT IT IS, BUT LET'S TALK ABOUT WHETHER A

17   DIFFERENT RESULT IS PROBABLE.

18        THE DEFENDANT HAS THE BURDEN OF PROVING THAT THE

19   NEWLY-DISCOVERED EVIDENCE WOULD PROBABLY CAUSE A DIFFERENT

20   RESULT ON RETRIAL OF THE CASE.  AN INDEPENDENT DECISION MUST

21   BE MADE BY THE TRIAL JUDGE ON WHETHER OR NOT THE NEW EVIDENCE

22   MIGHT RENDER A DIFFERENT RESULT PROBABLE BEFORE ANY OTHER

23   FINDER OF FACT.

24        IN THIS REGARD, I POINT OUT THAT THE FACT THAT THE TRIAL

25   JUDGE WHO WAS THE FINDER OF FACT IN THE TRIAL WOULD FIND THAT

26   IT WOULD NOT CHANGE HIS MIND IS IRRELEVANT.  AND THIS IS

27   BECAUSE, IF THE EVIDENCE IS OBJECTIVELY STRONGER AND IT WOULD

28   HAVE MADE A DIFFERENCE TO ANOTHER TRIER OF FACT, THEN WE SAY

1    THAT A DIFFERENT RESULT WOULD BE PROBABLE.

2        NOW, ONE OF THE THINGS THAT I BELIEVE TO BE SIGNIFICANT

3    IN THIS CASE, WHICH WOULD MEAN THAT THERE WOULD BE NO

4    DIFFERENT RESULT IN FRONT OF A DIFFERENT TRIER OF FACT, THAT

5    BEING A JUDGE OR A JURY, THE EVIDENCE IN THIS CASE AGAINST

6    THE DEFENDANT WAS STRONG.  MR. GARCIA IDENTIFIED THE

7    DEFENDANT, AND THE VERY NEXT DAY THE DEFENDANT WAS FOUND IN

8    POSSESSION OF THE VEHICLE.  SO YOU HAVE THE EYEWITNESS

9    TESTIMONY CORROBORATED BY THE PHYSICAL EVIDENCE.

10        AND THIS IS NOT THE KIND OF CASE WHERE THE ISSUE OF

11    CROSS-RACIAL IDENTIFICATION IS A MATTER WHICH MIGHT LEAD TO

12    MISIDENTIFICATION.  THE FACT THAT THE DEFENDANT WAS FOUND IN

13    POSSESSION OF THE VEHICLE THE VERY NEXT DAY AND WAS

14    IDENTIFIED BY THE PERSON FROM WHOM THE VEHICLE WAS TAKEN, IN

15    THIS COURT'S VIEW, MITIGATES AGAINST THE FINDING THAT A

16    DIFFERENT TRIER OF FACT WOULD REACH A DIFFERENT CONCLUSION.

17        SO, IN THIS REGARD, THE COURT FINDS THAT, FIRST, THE

18    EVIDENCE IS NOT NEWLY DISCOVERED; IT WAS PROVIDED TO THE

19    DEFENDANT.  THE FACT THAT HE FOCUSED ON IT IN SOME DIFFERENT

20    WAY DOES NOT MAKE IT NEWLY DISCOVERED.

21        HE DID NOT MOVE TO CONTINUE THE MATTER TO HAVE THOSE

22    WITNESSES PRODUCED.  IN FACT, MY IMPRESSION WAS HE DIDN'T

23    WANT THOSE WITNESSES PRODUCED BECAUSE, ALTHOUGH THEY HAD NOT

24    BEEN ABLE TO IDENTIFY HIM IN A PHOTO SPREAD, LOOKING AT HIM

25    IN TRUE LIFE MIGHT HAVE RESULTED IN THEM IDENTIFYING HIM.

26    AND RATHER THAN HAVING THE ONE WITNESS IDENTIFY HIM AND THEN

27    HAVING HIM BE IN THE POSITION TO ARGUE THAT THIS ONE WITNESS

28    WAS WRONG, PRODUCING THE OTHER TWO WITNESSES WHO PERHAPS

1    WOULD HAVE IDENTIFIED HIM WOULD THEN HAVE MADE THAT TASK

2    IMPOSSIBLE.

3        WHEN YOU TAKE THAT WITH THE FACT THAT HE WAS FOUND IN

4    THE VEHICLE A DAY LATER, YOU HAVE NO CHANCE.  AND I SAY THAT

5    BECAUSE THE FIRST THING HE WANTED TO KNOW WAS WHETHER THE

6    PEOPLE WERE GOING TO CALL THESE WITNESSES.

7        SO THE COURT'S OF THE VIEW THAT IT IS NOT

8    NEWLY-DISCOVERED EVIDENCE AND THAT, EVEN IF IT WERE, THAT TO

9    HAVE THOSE PERSONS WOULD NOT LEAD TO A DIFFERENT RESULT.

10   IT'S NOT THAT THEY PICKED OUT SOMEONE DIFFERENT OR SAID THAT

11   HE WAS NOT THE PERSON.  SO THE COURT'S OF THE VIEW BASED UPON

12   THE APPLICABLE CASE LAW THAT THE MOTION FOR NEW TRIAL SHOULD

13   BE DENIED, AND THE MOTION FOR A NEW TRIAL IS THEREFORE

14   DENIED.

15       AS TO THE MATTER OF SENTENCING, I HAVE READ THE REQUEST

16   BY COUNSEL TO STRIKE THE PRIORS AND THE PEOPLE'S OPPOSITION

17   TO THAT REQUEST, AND I'D BE MORE THAN HAPPY TO HEAR FROM

18   COUNSEL AS TO ANY ADDITIONAL THAT EITHER OF YOU WOULD LIKE TO

19   SHARE WITH THE COURT AND FROM MR. DURAN HIMSELF IF THERE IS

20   ANYTHING THAT HE WOULD LIKE TO ADD.

21       FIRST, DEFENDANT WAIVES ARRAIGNMENT FOR JUDGMENT AND

22   SENTENCING?

23       MR. DALEY:  SO WAIVED, YOUR HONOR.

24       THE COURT:  ANY LEGAL CAUSE TO SHOW WHY JUDGMENT SHOULD

25   NOT NOW BE PRONOUNCED?

26       MR. DALEY:  NO, YOUR HONOR.

27       THE COURT:  AS I SAID, I HAVE READ THE PROBATION

28   OFFICER'S REPORT IN THIS MATTER ORIGINALLY FILED IN FEBRUARY



# IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
## FOR THE COUNTY OF SAN DIEGO

31

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA,<br>Plaintiff,<br><br>v.<br><br>JOSEPH ALFONSO DURAN,<br>*dob 03/22/68, Booking No. 04101980A*<br>*aka Joseph Alphonso Duran;*<br><br>Defendant | CT No.  SCS181667<br>DA No.  BAN298<br><br><br>INFORMATION |

## CHARGE SUMMARY

| Count | Charge | Issue Type | Sentence Range | Special Allegations | Allegation Effect |
|---|---|---|---|---|---|
| 1 | PC215(a)<br>DURAN, JOSEPH ALFONSO | Felony | 3-5-9 | | |
| 2 | PC211<br>DURAN, JOSEPH ALFONSO | Felony | 2-3-5 | | |
| 3 | VC10851(a)<br>DURAN, JOSEPH ALFONSO | Felony | 16-2-3 | | |
| 4 | PC496d<br>DURAN, JOSEPH ALFONSO | Felony | 16-2-3 | | |

PC667(b) thru (i) and PC1170.12               "THREE STRIKES LAW"

The District Attorney of the County of San Diego, State of California, accuses the Defendant(s) of committing, in the County of San Diego, State of California, the following crime(s):

# CHARGES

**COUNT  1  - CARJACKING**

On or about January 11, 2004, JOSEPH ALFONSO DURAN did unlawfully take a motor vehicle in the possession of Jose Garcia by force and fear, from his/her person and immediate presence, against his/her will and with the intent to either permanently or temporarily deprive such person of the possession of said vehicle, in violation of PENAL CODE SECTION 215(a).

**COUNT  2  - ROBBERY**

On or about January 11, 2004, JOSEPH ALFONSO DURAN did unlawfully and by means of force and fear take personal property from the person, possession and immediate presence of Jose Garcia, in violation of PENAL CODE SECTION 211.

**COUNT  3  - UNLAWFUL TAKE AND DRIVE A VEHICLE**

On or about January 12, 2004, JOSEPH ALFONSO DURAN did unlawfully drive and take a vehicle, the personal property of Jose Garcia, without the consent of and with intent either permanently or temporarily to deprive the owner of title to and possession of said vehicle, in violation of VEHICLE CODE SECTION 10851(a).

**COUNT  4  - BUY/RECEIVE/CONCEAL/SELL/WITHHOLD STOLEN VEHICLE**

On or about January 12, 2004, JOSEPH ALFONSO DURAN did unlawfully buy, receive, conceal, sell, withhold and aid in concealing, selling and withholding a motor vehicle, as defined in Section 415 of the Vehicle Code, which property had been stolen and obtained in any manner constituting theft or extortion, knowing such property to be stolen or so obtained, in violation of PENAL CODE SECTION 496d.

# PRIORS

*JOSEPH ALFONSO DURAN:*

PROBATION DENIAL PRIORS

And it is further alleged that said defendant, JOSEPH ALFONSO DURAN, was previously convicted twice or more in this state of a felony, and in any other place of a public offense which if committed in this state would be punished as a felony, within the meaning of PENAL CODE SECTION 1203(e)(4).

| Charge | Date of Conviction | Court Number | Court | County | State |
|---|---|---|---|---|---|
| PC487.3 | 03/01/1991 | PA005661 | Superior Court | Los Angeles | CA |
| PC245(A)(1) | 05/26/1999 | SCN097637 | Superior Court | San Diego | CA |
| PC1192.7(C)(23) | 05/26/1999 | SCN097637 | Superior Court | San Diego | CA |

FIRST PRISON PRIOR

And it is further alleged that said defendant, JOSEPH ALFONSO DURAN served a separate prison term for such offense(s), which under California law is punishable by imprisonment in state prison whether in California or elsewhere, and that he has not remained free of prison custody and free of the commission of an offense resulting in a felony(ies) conviction for five years subsequent to his release from prison for the felony(ies) below, within the meaning of PENAL CODE SECTION 667.5(b) AND 668.

| Charge | Date of Conviction | Court Number | Court | County | State |
|---|---|---|---|---|---|
| PC487.3 | 03/01/1991 | PA005661 | Superior Court | Los Angeles | CA |

SECOND PRISON PRIOR

And it is further alleged that said defendant, JOSEPH ALFONSO DURAN served a separate prison term for such offense(s), which under California law is punishable by imprisonment in state prison whether in California or elsewhere, and that he has not remained free of prison custody and free of the commission of an offense resulting in a felony(ies) conviction for five years subsequent to his release from prison for the felony(ies) below, within the meaning of PENAL CODE SECTION 667.5(b) AND 668.

| Charge | Date of Conviction | Court Number | Court | County | State |
|---|---|---|---|---|---|
| PC245(A)(1) | 05/26/1999 | SCN097637 | Superior Court | San Diego | CA |
| PC1192.7(C)(23) | 05/26/1999 | SCN097637 | Superior Court | San Diego | CA |

# PRIORS (cont'd)

*JOSEPH ALFONSO DURAN:*

## FIRST VIOLENT FELONY PRISON PRIOR

And it is further alleged that said defendant, JOSEPH ALFONSO DURAN, was convicted of the following felony(-ies) and served a separate prison term for such offense(s) and has not remained free of prison custody and free of the commission of an offense(s) resulting in a felony conviction for ten years subsequent to release from prison for the violent felony(s) below, within the meaning of PENAL CODE SECTION 667.5(a).

| Charge | Date of Conviction | Court Number | Court | County | State |
|---|---|---|---|---|---|
| PC245(A)(1) | 05/26/1999 | SCN097637 | Superior Court | San Diego | CA |
| PC1192.7(C)(23) | 05/26/1999 | SCN097637 | Superior Court | San Diego | CA |

## FIRST SERIOUS FELONY PRIOR

And it is further alleged that said defendant, JOSEPH ALFONSO DURAN, was convicted of the following serious felony(ies), separately brought and tried, which under California law is punishable by imprisonment in state prison, within the meaning of PENAL CODE SECTIONS 667(a)(1), 668, AND 1192.7(c).

| Charge | Date of Conviction | Court Number | Court | County | State |
|---|---|---|---|---|---|
| PC245(A)(1) | 05/26/1999 | SCN097637 | Superior Court | San Diego | CA |
| PC1192.7(C)(23) | 05/26/1999 | SCN097637 | Superior Court | San Diego | CA |

## STRIKE PRIOR(S)

And it is further alleged pursuant to Penal Code sections 667(b) through (i), 1170.12, and 668 that the defendant, JOSEPH ALFONSO DURAN, has suffered the following prior conviction(s) and juvenile adjudication(s), which are now serious or violent felonies under California law whether committed in California or elsewhere.

| Charge | Date of Conviction | Court Number | Court | County | State |
|---|---|---|---|---|---|
| PC245(A)(1) | 05/26/1999 | SCN097637 | Superior Court | San Diego | CA |
| PC1192.7(C)(23) | 05/26/1999 | SCN097637 | Superior Court | San Diego | CA |

THIS INFORMATION, NUMBERED SCS181667, CONSISTS OF 4 COUNTS.

                                    BONNIE M. DUMANIS
                                    District Attorney
                                    County of San Diego
                                    State of California
                                    by:

_5 | 3 | 04_____                  _____
Date                                Deputy District Attorney

Informal Defense Request Discovery

00021

Joseph Alfonso Duran #4101980
1173 Front St
San Diego, CA 92101
(619)

In Propria Persona

F I L E D
Clerk of the Superior Court

NOV 24 2004

By: M. TURNER

Superior Court of the State of California
County of San Diego

People of the State of California,
Plaintiff

vs.

Joseph Alfonso Duran,
Defendant,

Dept. 16
NO. CS181667 / BAN298
Informal Request
for Discovery
(PEN C § 1054.5(b))
Declaration of Joseph
A. Duran

To Roderick W. Shelton for Bonnie Dumanis, District attorney of San Diego County: Notice is hereby given that I presently represent defendant, Joseph Alfonso Duran, who is charged with violation of P.C. 215(a), P.C. 211, V.C. 10851(a), P.C. 496(d), in Docket No. CS181667. Defendant is next to appear in department, 16 of the South Bay Superior Court on 12.01. 04. Pursuant to penal code section 1054.5(b), I hereby request that on or before the date of that appearance, or as soon thereafter, as may be heard, you provide me with copies of the following in- formation, or provide me with the opportunity to review all of the following information: the names, current addresses and telephone num-

Copy given to R.A. on 11-24-04 by staff

bers of all witnesses to be called to testify again-
st the defendant at trial and of all percipient
witnesses and potential witnesses, whether or not
the prosecution to call the witnesses to testify
against the defendant at trial: (See Penal Code Sect-
ions 1054.1(a), 1054(e); Brady V. Maryland (1963)
373 US 83, 83 S Ct 1194, 10 L Ed 2d 215. See also In
re Littlefield (1993) 5 C 4th 122, 19 CR 2d 248.)
All statements or utterances by the defendant oral
or written, however recorded or preserved, whether or
not signed or acknowledged by the defendant
(Penal Code section 1054.1(b), (e); Brady V. Mary-
land, supra.) All notes & observations of the
defendants physical appearance, emotional state,
or sobriety by law enforcement personnel or their
agents at or near the time of the defendant's arrest.
(See People V. Hayd ., supra.)
    All physical evidence obtained in the inves-
tigation of the case against the defendant. (Penal
code section 1054.1(c), (e).)
    All photographs, transparencies, slides,
diagrams, motion pictures and videotapes of the
scene of the alleged offense. (Penal Code section
1054.1(c), (e).)
    All photographs, motion pictures, or videotapes
of the defendant made at or near the time of defen-
dant's arrest in this case. (Penal code section
1054.1(c), (e).)

All photographs, videotapes, motion pictures, composites, or likenesses shown to witnesses prospective witnesses in this case for the purpose of establishing the identity of suspects in the crime charged against the defendant, and all reports concerning the display of such. (Penal code section 1054.1 (c), (e).)

The names and addresses of each witness shown or attending a line-up involving the above-entitled case and the results of any such line-up.

Any exculpatory evidence, information, documents, and other materials in the possession of, or that have come to the attention of, the district attorney or of any police department involved in the investigation of the case against the defendant. (Penal code sections 1054.1 (e), 1054 (e). See Giglio v. U.S. (1972) 405 US 150, 92 S ct 763, 31 L Ed 2d 104; Brady v. Maryland, supra.)

Any record of criminal arrests or convictions (whether for felonies or misdemeanors) of any witness to be called to testify against the defendant. (Penal code sections 1054.1 (e) 1054(e); People v. Lang (1989) 49 C3d 991, 264 CR 386; People v. Harris (1989) 47 C3d 1047, 255 CR 352. See People v. Pinholster (1992) 1 C4th 865, 938, 939, 4 CR2d 765; People v. Pensinger (1991) 52 C3d 1210, 1271, 278 CR 640.)

Any promises and/or inducements of any

00024

Kind made by the prosecution to induce or encourage a witness to assist the prosecution in its investigation of the above-entitled case, or to induce a witness to testify for the prosecution in the above-entitled case. (See Penal Code section 1054.1(e); Brady v. Maryland, supra.)

Any information relevant to impeachment of any witness that the prosecution intends to call at the trial, including any threats, promises, inducements, offers of reward or immunity, affirmative representations made or implied, and any record of convictions, or of pending charges, probation, or parole. (Penal Code sections 1054.1(e), 1054(e). See People v. Pinholster, supra; Davis v. Alaska (1974) 415 US 308, 39 L Ed 2d 347, 94 S Ct 1105.)

All records concerning the arrest of the alleged victim, complaints filed against the victim, or information concerning incidents of specific acts of aggression by the alleged victim, as well as the names, addresses, and phone numbers of witnesses to such acts. (Penal Code sections 1054.1(e); Engstrom v. Superior Court (1974) 7 C4th 978, 30 CR2d 651.)

The identity and whereabouts of any material informants. (Penal Code sections 1054.1

(e), 1054 (e). See People v. Hobbs (1994) 7 C4th 948, 30 CR2d 651.)

All written or recorded statements of of witnesses who will testify. (Penal Code Sections 1054.1(e)-(f).)

All written or recorded statements of percipient witnesses, whether or not they will be called to testify. (Penal Code sections 1054.1(e), 1054(e).)

All photograps, videotapes, audiotapes, and movies concerning this case. (see Penal Code section 1054.1(e).)

All laboratory, technician, and other other reports concerning the testing and examination of evidence concerning this case. (Penal Code section 1054.1(e)-(f).)

All reports of experts made in conjunction with this case, involving the results of physical or mental examinations, scientific tests, experiments, or comparisons that the prosecutor intends to offer in evidence at the preliminary hearing or at trial, and all reports of experts who reviewed the work of a prosecution expert who will testify at the preliminary hearing or at trial. (Penal code section 1054.1(e)-(f).)

All notes and reports of police officers

00026

1 and investigators concerning the offense
2 charged. This includes reports concern-
3 ing all aspects of this crime, e.g., the
4 crime, the defendant's arrest, law en-
5 forcement activities and observations,
6 and conversations with witnesses and
7 potential witnesses. (Penal Code section
8 1054.1(e)-(f).)
9   All reports and notes of any law
10 enforcement officers or investigators
11 concerning the defendant and/or the
12 above-entitled case that are maintained
13 separately from the official file, e.g.,
14 as "current investigation files," "field
15 identification notes," or "street files."
16   Any evidence to be used in rebuttal
17 of the defense case. (Izzajaga v. Sup-
18 erior Court (1991) 54 C3d 356, 285 CR 231;
19 People v. Bunyard (1988) 45 C3d 1189, 249
20 CR 71.)

21
22   Defendant asks that this document
23 be treated as a continuing request
24 through the completion of trial.
25   Thank you in advance for your cooperation.
26 Date: 11.15.04                    Joseph Alfonso Duran
27 Recieved by:                      JOSEPH ALFONSO DURAN
28 Date:                             In PRO-PER

00029

FILED

SAN DIEGO SUPERIOR COURT

DEC 1 0 2004

CLERK OF THE SUPERIOR COURT

BY _____ M. ZAVALA

1    Joseph Alonso Duran
2    1173 Front Street
3    San Diego, CA 92101
4
5         Superior Court Of The State Of California
6         In And For The County Of San Diego
7    The People Of The State Of          CASE NO.: CS181667
8    California,                          BAN NO: 298
9              Plaintiff                  Notice Of Motion Disclosure
                                          Of Brady, Wheeler, Penal Code
10   vs.                                  Section 1054. (e)
11   Joseph Alonso Duran                  Date: 1-24-05   1-3-05
12                                        Time: 9:00 A.M.
13             Defendant,                 Dept: 16

14   I Joseph Duran, In Pro-Per Hereby respectfully
15   moving The Honorable Court For An Order Directing
16   The District Attorney For The County Of San Diego;
17   By Deputy District Attorney: R. Shelton To Records
18   To Disclose And Provide Said Defendant Movant
19   An Indexed Copy Of Any Promise Of Leniency To Any
20   Witness(es), C.I.
21   Cooperating Witness(es) All <u>Brady vs. Maryland, 373</u>
22   <u>U.S. 83 (1963)</u>; Materials, Any And All <u>People vs.</u>
23   <u>Wheeler (1992) 4 Cal. 4th 284</u>, Materials And All
24   <u>United States vs. Bagley, 473 U.S. 667 (1985)</u> All
25   <u>United States vs. Roviaron, 353 U.S. 53 (1951)</u> Materials
26   For All The Witness(es), Including W/O Limitations
27   Expert Witness(es) And Any And All Penal Code Section
28   1054.(e) Materials.

Copy to research att, 12-10-04 zm4

00030

# Declaration

I, Joseph Alfonso Duran, Declare And Say Fore-Going Following: 1.) I Am The Defendant In People vs. Joseph Alfonso Duran, Case # CS181667, Acting In Pro-Per, And Making This Declaration In Support Of My Motion For Disclosure Of Brady, Wheeler, Penal Code Section 1054(e) Materials And Witness(es) List, And Information. 2.) I Need This Evidence/Information To Research And Prepare Any And All Meritorious Defenses To The Prosecutions. 3.) I DO Not Believe The Prosecution Has Made A Full And Complete Disclosure Of Brady, Wheeler And/Or Penal Code Section 1054(e) Material, Including A Witness(es) List, A Full And Disclosure Of My Reasons That I Believe The Prosecution Is Withholding Information That Would Involve Privacy Act Materials And Inseparably Compromise My Intended Defense To The Alleged Charges.

I, Joseph Alfonso Duran, Declare Under Penalty Of Perjury Under The Laws Of The State Of California And 28 U.S.C. 1746(2)

Date: 12.1.04

Respectfully Submitted,
Joseph A. Duran
In Pro-Per.

00231

1  WILLIAM D. DALEY
   Attorney at Law
2  535 "H" Street
   Chula Vista, CA  91910
3  (619) 426-2685
   State Bar Number 64002
4

5  Attorney for Defendant
   JOSEPH ALFONSO DURAN
6

7

8  **SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO**
   **SOUTH COUNTY DIVISION**

9  PEOPLE OF THE STATE OF CALIFORNIA,       )  SC No. CS 181667
                                            )  DA No. BAN 298
10               Plaintiff,                  )
                                            )  **NOTICE OF MOTION AND**
11                                          )  **MOTION FOR A NEW TRIAL .**
                                            )  **PURSUANT TO PENAL CODE**
12                                          )  **SECTION 1181AND POINTS**
         vs.                                )  **AND AUTHORITIES IN**
13                                          )  **SUPPORT THEREOF**
    JOSEPH ALFONSO DURAN                    )
14                                          )
                                            )
15               Defendant.                 )  Date:  July 14, 2005
   ─────────────────────────────────────── )  Dept:  15
16                                             Time:  9:00 a.m.
17
   **TO:  THE DISTRICT ATTORNEY, BONNIE DUMANIS, COUNTY OF SAN**
18      **DIEGO, AND MINOZ BHAYANI, DEPUTY DISTRICT ATTORNEY:**

19 **NOTICE IS HEREBY GIVEN** that on July 14, 2005 or as soon thereafter as the

20 matter may be heard, in Department 15 of the above-entitled court of the

21 county of San Diego, state of California, the defendant, , by and through his

22 attorney, WILLIAM D. DALEY, will move pursuant to Penal Code section 1181

23 for a new trial.

24

25

26

27 ────────────────────
   MOTION FOR A NEW TRIAL
28                                    -1-

This motion is based on this notice of motion, the attached memorandum of points and authorities, the records and file in this action, and on the evidence as may be presented at the hearing of this motion.

## MEMORANDUM OF POINTS AND AUTHORITIES

### STATEMENT OF THE CASE

Following a jury trial in this matter the Defendant, the jury returned a verdict of guilty as to:

Count One: 215 (a) P.C. Car jacking

Count Two: 211 Robbery

Count Three : 10851 (a) V.C.

With the following true findings by the Court:

667.5 (a) Violent felony prior

667.5 (b) First prison prior

667.5 (b) Second prison prior

667 (a) (1) First Serious Felony prior

667 (a) (1) Second Serious Felony prior

667 (b)- (i) 1170.12 Strike Prior (PA 005661)

667 (b)- (i) 1170.12 Strike Prior (SCN 097637)

### STATEMENT OF FACTS

On January 11, 2004, a Hispanic male adult approached Jose F. Garcia, a sales representative at McCune Chrysler Jeep in National City, CA to test drive a 2000 green jeep for possible purchase. The perpetrator drove the Jeep off the sales parking lot while Mr. Garcia sat in the passenger seat.

00233

1 Once out the parking area to the dealership, the perpetrator pulled into

2 another parking lot area at the request of Mr. Garcia so that a balloon could

3 be removed that was tied to the vehicle. After the vehicle was stopped and

4 before Mr. Garcia got out of the vehicle, the perpetrator lifted up his shirt and

5 exposed an object with a handle. The perpetrator, then told Mr. Garcia : "

6 Why don't you get the fuck out" of the vehicle. Mr. Garcia exited the vehicle

7 and returned to the dealership where the police were called.

8      On January 12, 2004, the Defendant, Joseph Duran was stopped by a

9 San Diego Sheriff's Deputy for a traffic violation, while he as driving the 2000

10 green jeep that had been taken the day before from McCune Chrysler Jeep.

11 Mr. Garcia identified Joseph Duran as the perpetrator in a photo line-up. He

12 testified at trial and identified Mr. Duran as the person who took the vehicle.

13      Mr. Duran testified at trial that he was not the perpetrator and that

14 there had been a misidentification by Mr. Garcia. He indicated that the jeep

15 had been loaned to him by a neighbor.

16      Mr. Duran represented himself during the course of the trial, In Pro

17 Per.

18 ///

19

20 ///

21

22 ///

23

24 ///

25

26

27

MOTION FOR A NEW TRIAL

28                              -3-

00234

## POINTS AND AUTHORITIES

I

*THE COURT SHOULD GRANT THE MOTION FOR A NEW TRIAL BASED UPON NEWLY DISCOVERED EVIDENCE AND THE FAILURE OF THE PROSECUTION TO PROVIDE RELEVANT EVIDENCE IN VIOLATION OF 1054.1 P.C./ Brady ERROR*

A.  THE PEOPLE FAILED TO PROVIDE RELEVANT INFORMATION AS PROVIDED UNDER PENAL CODE § 1054.1 P.C./ *BRADY* ERROR

Penal Code § 1054.1 states in pertinent part as follows:

"The prosecuting attorney shall disclose to the defendant or his or her attorney all of the following materials and information, if it is in the possession of the prosecuting attorney or if the prosecuting attorney knows it to be in the possession of the investigating agencies:.....

... (c) All relevant real evidence seized or obtained as a part of the investigation of the offenses charged...

....(d) Any exculpatory evidence..."

The Defendant, Joseph Duran, represented himself, In Pro Per, during the trial of this matter. Attached hereto and incorporated by reference is his declaration. Mr. Duran indicates that he did not receive the names or information with regard to two eye witnesses until the end or conclusion of the trial. He indicates the prosecutor gave him a three page report of Officer E.Cordero. That report identified two potential witnesses, RAQUEL MARTINEZ ROBINSON and OSCAR OCHOA. A copy of the report is attached to Mr. Duran's affidavit, and incorporated herein by reference.

00235

Both of these witnesses were employees of McCune Chrysler Jeep who were eyewitnesses of the individual who took the Jeep, which is the subject of this action. They were shown photo lineups by officer E. Cordero in January 2004, which included the Defendant, Joseph Duran, and neither of the witnesses identified him.

At the conclusion of the trial, the last day, Mr. Bayani presented the report to Mr. Duran for the first time. A discussion regarding the report is contained on pages 305-309 of the trial transcript. Mr. Duran did not have the time or opportunity to review, study or analyze the report. It was unclear to Mr. Duran as to the substance or significance of the report that was late in its delivery, placing Mr. Duran at a disadvantage in his preparation and presentation of his case.

The following exchange was made at the time the issue was initially raised in the trial on February 3, 2005, the last day of the trial.

--------------

"Mr. Duran: I'd like to bring the Court's attention to the Detective Follow-up report that Mr. Bhayani claims was just handed to him.

The Court: I don't have any report, so I don't know what you're speaking about.

Mr. Duran: Maybe you would ask the Prosecutor for that report.

Mr. Duran: It's a copy of the detective follow-up report by Officer E. Cordero, the six pack photo line-up officer. It is a detective follow-up report that's cumulative to officer Gisi's report and minus the six-pack photo line-up statement by Jose Garcia.

Mr. Duran: What I'm asking the Court is to exclude this statement by Officer Cordero as it's cumulative. It's the exact replica of Officer Gisi's

MOTION FOR A NEW TRIAL

00236

statement as to —I'm sorry. As to this investigation from Mr. Garcia.

The Court: Okay. Let me ask you this: Does that officer say: I showed him a lineup, that he identified you as the perpetrator?

Mr. Duran: Minus that I ask to be excluded.

The Court: Well, what is it that—

Mr. Duran: It states that on January the 11th Officer Gisi took a car jacking report. According to this report, a Hispanic male approached Garcia, inquired about a jeep 2000, took it for a test drive, drove off the parking lot Garcia in the passenger seat. Suspect pulled into a parking lot, asked Garcia to remove a balloon. Garcia exited the jeep. Suspect lifted his shirt, exposing handle or a black medium handgun. Suspect told Garcia, "Why don't you get the fuck out?' Suspect drove off Westbound.

I mean, it's identical to Mr. — Officer Gisi's report, and it brings no new information to — that would help the jury in determining innocence or guilt.

The Court: Shows that the witness has been consistent in his description of what happened..

Mr. Duran: Well, that statement was made five minutes or two minutes after the alleged crime happened. I mean, I think that in itself is his statement.

The Court: But the point being, you asked him about his prior conviction for the purpose of attempting to impeach him, to tell the jury that his testimony is not to be believed—

Mr. Duran: Well, actually, your honor—

The Court: — Is that right?

Mr. Duran: — No. What I was—

MOTION FOR A NEW TRIAL

-6-

00237

The Court:  Why did you ask him about his felony conviction?

Mr. Duran: To impeach his testimony.

The Court: And so what he's trying to do is – with the officer, is rehabilitate him to show that this witness has been consistent in describing what happened.

Mr. Duran: The statement doesn't say that 'Garcia told me.' It's just a narrative. It doesn't say "Mr. Garcia told me, Officer E. Cordero.' And then the statement reads on. It just states on 'January 11, 2004,' and then as I read earlier.

The Court:  Okay.  And part of the problem, I think, Mr. Duran, is that not being legally trained, you are imposing what you think that police reports ought to say rather than what police reports normally do say.

So, Mr. Bhayani?

Mr. Bhayani:   Judge, I was just going to comment that the report that Mr. Duran is referring to there is a synopsis of the crime which he just read t the Court.  Cordero's testimony, so that Mr. Duran knows ahead of time, is really regarding the construction of the photo line-up and the prior identification of Mr. Duran by Mr. Garcia.  So maybe that will help him.

Mr. Duran:  I that indicating— again, as you just noted, I'm not a professional lawyer.  Is the prosecution telling me that he's not going to ask officer Cordero to read an identical report that was issued by Officer Gisi?  Is that what he is saying?

The Court: I don't know if that's what he's saying, but even if he asks those same questions, the objection, on cumulative, grounds would be overruled.

This boils down to whether you believe Mr. Garcia.  And you made

MOTION FOR A NEW TRIAL                    -7-

00238

much of the fact that , you know, did the witness say that he pointed a gun

and he showed him a gun, trying to create in the minds of the jury that this

testimony is to note be believed.   And when he tells the same account over

and over again, then the jury can say, well, you know, there is this thing

called the prior consistence statement , under <u>People versus Green</u>, which

says that the statement made earlier in time  – the jury can consider that and

conclude that that is the truth of the matter stated.

So the objection, on cumulative grounds, will be overruled.

Mr. Duran: Does Mr. Bhayani plan on calling Raquel Martinez

Robinson and Oscar Ochoa as witnesses?

The Court: I don't know, sir.

Mr. Bhayani:   I have provided to both the Court and Mr. Duran a

witness list, and so he's on notice as to the witnesses I intend to call.

Mr. Duran: Seeing that these names, your honor, are not on the

witness list, can the statements still be read in Court without the actual

witnesses?

The Court:   Sir, I can't give you legal advice. I told you that from

the outset, and you keep asking me questions about what is legally

permissible.

What the Court does is it rules when evidence is offered and some

objection is made.

Mr. Duran: then the Defense moves to exclude the statements of

the Officers' narrative by Raquel Martinez Robinson and Oscar Ochoa on the

grounds—

The Court:   Well, since there is no Ochoa on the witness list and

he just told you he only planned on calling the people on the witness list, I

MOTION FOR A NEW TRIAL

- 8 -

00239

don't understand our motion.

Mr. Duran:   The this can't be read as a narrative by officer Cordero  since these people aren't here to testify to the truth  — to the validity of what they — what's in the report.

The Court: Well, sir, he can't read  — well, there is no witness on the stand who is offering testimony.  If that witness is up and you have some objection, make your objection then, and the Court will rule.

Mr. Duran:   Thank you, your honor..

—————————————

The trial continued with Mr. Duran's cross - examination of Mr. Garcia.      The trial concluded and most the the jury instructions given to the jury on that date.

In *Brady v. Maryland,* 373 U.S. 83, 87, the United State Supreme Court held "the suppression by the prosecution of evidence favorable to an accused upon request violated due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  In *In re Ferguson* (1971) 5 Cal.3d 525, 532-533 the California Supreme Court imposed a stricter duty upon prosecutors by requiring them to disclosed substantial material evidence favorable to the accused without request.

Material evidence , is evidence "which tends to influence the trier of fact because of its logical connection with the issue" (People v. Morris (1988) 46 Cal.3d 1).  The duty to disclose evidence favorable to the accused extends to evidence which may reflect on the credibility of a material witness. (*People*

MOTION FOR A NEW TRIAL

00240

*v. Ruthford* (1975) 14 Cal.3d 399 ; *People v. Garcia* ( 1993) 17, Cal.App 4th 1169.

There was  significant and relevant evidence which was not timely provided to the Defense.[1]   Mr. Duran was placed at an extreme disadvantage by the People in his case by the failure  to provide significant witness information until the last day of trial.  Mr. Duran did not have the time or opportunity to review and interpret the report that was given to him at the last minute.  His initial  brief review of the report led him to believe that the new witnesses were affirming the identification in a photo lineup that had been made by Mr. Garcia.  After the trial had ended he had an opportunity review the report more throughly and realized that the two witnesses mentioned did not identify him and clearly had a different description of the suspect.  He immediately had his investigator attempt to interview the two witnesses, which resulted in the identification of another previously unknown eye witness.

The foregoing discussion in the trial demonstrates the fact that he had just received the report and that he had not had an opportunity to fully review the report.

---

[1] In this motion the Defendant does not waive any claim of ineffective assistance of counsel, despite the In Pro Per status of the Defendant at the time of trial, as it pertains to any finding of failure to call witnesses, or seek  a continuance to subpoena witnesses and alternatively seeks a ruling.

---

MOTION FOR A NEW TRIAL

-10-

00241

### B. THE ADDITIONAL WITNESSES PROVIDE NEW EVIDENCE OR IN THE ALTERNATIVE PROVIDE, WRONGFULLY WITHHELD EVIDENCE WHICH SHOULD HAVE BEEN MADE AVAILABLE PRIOR TO TRIAL.

Penal Code §1181 (8) states in pertinent part as follows:

"When a verdict has been rendered or a finding made against the defendant, the court may, upon his application, grant a new trial, in the following cases only:.....8. When new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at trial....."

A motion for a new trial based upon the ground of newly discovered evidence must show that :

(1) The evidence is newly discovered;

(2) The evidence is not merely cumulative;

(3) The evidence is likely to result in a different verdict on retrial.

(4) The defendant could not with reasonable diligence, have discovered or produced the evidence at trial;

(5) The facts have been shown by the best evidence possible.

[*People vs. McDaniel* (1976) 16 Cal.3d 156; *People v. Cole* (1979) 94 Cal.App.3d 854].

After fully reviewing the newly discovered witnesses, in this case, Mr. Duran contacted his investigator , Frank G. Griffin, to contact the witnesses. Mr. Griffin's declaration is attached hereto and incorporated by reference. Mr. Griffin contacted Mrs. Robinson, who indicated that on January 11, 2004 she was approached by an individual who indicated he was interested in

MOTION FOR A NEW TRIAL
                                    -11-

purchasing a Jeep. This was the same individual who later took a jeep from Mr. Garcia. She indicated that she spent approximately 10 minutes with the individual: Her description of the individual was as follows:

---- 23-24 years of age; his hair was slicked back and curly, medium complexion, no sunglasses, eyes brown and a little beady. He did not have graying hair. She did not recall a broken arm. The individual spoke English without an accent. he was approximately 5" 6 " tall. She was shown a lineup by the police and was unable to identify anyone in the lineup. She was uncomfortable with the individual and referred them to another salesman, Jose Morales.

The photo lineup that was shown to Ms. Robinson was the same lineup that included a picture of Mr. Duran.

Mr. Griffin contacted Mr. Morales on February 25, 2005, who is an employee of McCune Motors. He indicated that on January 11, 2004 he had contact with a Hispanic male who had been referred to him by Mrs. Robinson. The individual was looking for a Jeep Wrangler. When he went to get the keys for the vehicle he learned that the person had left with another salesman and that the person had car jacked a jeep from Mr. Garcia. He described the individual as 20-21 years of age, skinny, he didn't believe he had on sun glasses; height 5 feet 6 inches.; spoke in English with no accent, he had a jacket draped over his arm, hair light brown and a little messy. He believes that he may still be able to identify the individual.

Mr. Griffin spoke to Oscar Ochoa at Ron Baker Chevrolet in National City , CA.. Mr. Ochoa indicated that on January 11, 2004 he was working at McCune Motors and was approximately 30–50 feet from the suspect, when he told Mr. Garcia to take care of him and if he got a sale he would get half. He

MOTION FOR A NEW TRIAL

indicated that he had been shown a photo lineup by the police but was unable to identify anyone.

Again, the photo lineup contained a picture of Mr. Duran.


C. <u>THE NEW EVIDENCE WILL RESULT IN A DIFFERENT VERDICT ON RETRIAL</u>

The defendant has the burden of proving that the newly discovered evidence will probably cause a different result on retrial of the case.  The test is not a subjective one, but an objective one.   Whether based upon the existing and new evidence a second trier of fact could  reach a different result. [*People v. Hairgrove* (1971) 18 Cal.App.3d 606].  An independent decision must be made by the trial judge on whether or not the new evidence might render a differed result probable before any other finder of fact. [*People v. Huskins* (1966) 245 Cal.App.2d 859 ; *People v. Minick* (1989) 214 Cal.App 3d 1478]

<u>Evidence which is only impeaching in character may be sufficient to warrant a new trial, if it is such that it will destroy a significant prosecution witness's testimony by raising serious doubts as to the witness's veracity and credibility.</u> *People v. Huskins* (1962) 57 Cal.2d 263.  In the *Huskins* case a new trial was granted when it was found that the sole adult witness in a molestation case had falsely charged someone of a similar offense.

The additional percipient witnesses inability to identify the Defendant, and the substantial variance in their description of the suspect as to age, height, weight, hair; is significant evidence which, if presented to the jury, would be the basis of raising a  reasonable doubt as to the identification by Jose Garcia.

MOTION FOR A NEW TRIAL

00244

II

**MOTION FOR A NEW TRIAL BASED UPON INSUFFICIENCY OF THE**

**EVIDENCE, § 1181 (6) P.C.**

A motion for a new trial made on the ground that the verdict is contrary

to the law or evidence under Penal Code Section 1181.(6) P.C. requires the

trial judge to independently review the evidence. *People v. Davis* (1995) 10

C4th 463, 523. Although the trial judge should not ignore the verdict he is

not bound by the jury's resolution of conflicts in the evidence ( *People v. Lopez*

(1969) 1 CA 3d 78, 85; *People v. Veitch* (1982) 128 CA3d 460, 467.)

The following discrepancies in the evidence warrants a review of the

evidence :

(A) The Defendant's hair was 2-3 inches long, wavy and curly; not short

or very short and slicked back as was described.

"Q. And when you were describing his hair—Let's look at the

length of his hair in this picture. Is that consistent with what Mr. Duran

looked like a year ago?

A. Yes. He had very short hair."

(Testimony of Mr Garcia trial transcript page 265 lines 23-16)

During cross examination Mr. Garcia indicated as follows:

Q. Please take a look again at Court's Exhibit 4A. Would you

tell us what style of hair that person has.

---

MOTION FOR A NEW TRIAL

-14-

00245

A.  Very short hair, combed back.

Q.  Is it short and slicked back?

A.  Not right there, but it's short."

( Testimony of Mr. Garcia, trial transcript page 289 lines 22-26).

(B) The Defendant did not have graying on the sides of his hair ; as was described by the witness.

"Yea, black hair with gray. Gray"

(Testimony of Mr. Garcia page 264 line 12)

On cross examination, Mr. Garcia indicated as follows:

" Q.  Court's Exhibit 4C shows a side angle.

You stated the suspect had slight gray at that time, January 11th of 2004

A.  Yes.

Q.  Does it appear to you that there's graying on the side?

A.  On that picture, no."

( Testimony of Mr. Garcia trial transcript, pages 289-290)

(C) The sunglasses on the Defendant at the time of his arrest; were not the sunglasses described by the witness as those of the suspect.

Mr. Garcia testified as follows:

" Q You said the suspect wore black sunglasses. Could you describe them.

A. Yes.  They were black, and they were glasses like the square type, like loafers.

MOTION FOR A NEW TRIAL

-15-

00246

Q. Pardon me?

A. Yes They were black, and they were glasses like the frame– like loafers type.

Q. Were they entire plastic frames?

A. I believe so, yes.

Q . The arms of the glasses were plastic?

A. I believe so, yes.

Q. The frame or the part that holds the lenses in place, were those plastic?

A. Yes.

Q. The— What they call the bridge, the center piece that holds both frames together ,were those plastic?

A.   I don't recall.  I didn't pay much attention to that.

Q. But you're sure they were black?

A. Yes.

Q. Were they wrap-around style, flat face?

A.   I believe they were flat face."

(Trial transcript page 293-294)


On further cross examination Mr. Garcia looked at Court Exhibit 1A , sunglasses taken from Mr. Duran at the time of his arrest.

Q. Can you take a look at those glasses, please.

A. (Witness complying.)

Q. Could you tell us what material the arms of the glasses are.

A. Looks like rubber.

MOTION FOR A NEW TRIAL

-16-

00247

Q. Could you tell us what material the frame that hold the lenses in place, could you tell us what material that is.

A. Looks like plastic.

Q. And the center piece holding the frames together, could you tell us what that looks like

A. Rubber.

Q. You stated they were black sunglasses?

A. Yes"        (Trial transcript pages 295-296)

(D) <u>The police officer's description of the defendant at the time of his arrest, was 20-30 pounds greater than was described by the witness as to the suspect.</u>

" I would estimate his weight probably about one sixty, something like that " (Mr. Garcia testimony page 265, line 2-3).

Officer Helms testified as follows of direct examination:

" Q. Now, as part of your arrest report after you had Mr. Duran in custody, did he give you a biographical information as to his height?

A. Yes.

Q. And what was that?

A. If I may refer to my police report?

Q. If it helps you refresh your recollection, please do.

A. Yes. Five Foot ten inches .

Q. Did he tell you how much he weighed at the time.

A. Hundred eighty pounds." (Trial transcript page 343 lines 2-13)

MOTION FOR A NEW TRIAL                    -17-

00248

As part of the description provided in Officer Helms arrest report he indicated the following description of Mr. Duran:

A. "Race is 'H,' for Hispanic, sex 'M', for male. 3/22/1968 would be the date of birth. Place of Birth Montebello, California. Five Foot, ten ; ; hundred eighty pounds; normal build; black hair; brown eyes....

.....

A. The hair length and type would be short and coarse. Hairstyle, military. Facial hair, mustache. Complexion was medium. General appearance, casual. Demeanor, calm. Speech, quiet, voice medium. "

(Trial transcript pages 348-349)


E. The Defendant was 5 years younger than was described by the witness originally.

"I believe I described him around 30— late thirties..."

( Testimony of Mr. Garcia; trial transcript , page 264, line 7)

On cross examination Mr. Garcia indicated as follows:

Q. And what description did you give the officer according to this report.

A. " A male Hispanic, 39, I believe.  39.  Blue thermal, tan jacket, grayish on the side of his hair, scars on his face."

(Testimony of Mr. Garcia , trial transcript, page 293 , lines 8-12)

The 911 call, which provided an age range of the suspect in his 40's.

MOTION FOR A NEW TRIAL

-18-

00249

Officer Helms testified as follows:

"  .....The date of birth provided was 3/22/1968.

Q. And how old would that make Mr. Duran at the time that you stopped him?

A. 35." (Trial transcript page 335, lines 12-15).


(F)  <u>The Defendant did not have the clothes consistent with what was described as worn by the suspect.</u>

"  ... I described with his jacket, the tan jacket, and the blue thermal that he had on, the jeans, the glasses and     ......."

(Testimony of Mr. Garcia, trial transcript , page 264, lines 16-18)

Photos showing Mr. Duran's appearance and attire at the time of his arrest were entered into evidence as Exhibits 4 A, B.C.  (Trial transcript page 340, 352 and page 388 lines 9-10)).

Additionally, no clothing items were found at this residence.

Q.  And where was he residing at the time?

A.  At the Lakeside hotel.

Q.  And did — after your investigation with Mr. Duran that night on 1/12/04, were you able to go to that location?

....  Q.  Did you go to that location the following morning?

A.  Yes.

Q.  And when you went to that location, what was the purpose for you to go to that location?

00250

A. It was an attempt to search for further evidence in the case.

Q. And that was to search his room; is that correct?

A. That's correct

Q. And were you able to locate any clothing, any personal items from the room that he was residing in?

A. No. the room had been cleaned out."

( Trial Transcript, page 344)

(G)  The <u>Defendant did not have a pistol or gun at the time of his arrest nor at his residence.</u>

**CONCLUSION**

Based upon all of the foregoing, the defendant is requesting that the motion for a new trial be granted.

Dated: 7/8/05

Respectfully submitted,

WILLIAM D. DALEY ESQ.
Attorney for Defendant

MOTION FOR A NEW TRIAL

-20-

onal City Police Department
National City Boulevard
onal City, CA. 91950
ne: (619) 336-4400

0 6 2 5 4

**Case #**
0400313

# PHOTO LINEUP

| Date): 01-14-04 | At (Hours): 1500 |

Location): 1200 NATIONAL CITY BLVD

m/Witness: GARCIA, JOSE F.

was read the following statement and then allowed to view the photo lineup:

I am going to show you a group of photographs. This group of photographs may or may not contain a picture of the person who committed the crime now being investigated. The fact that these pictures are being shown to you should not cause you to believe or guess that the guilty person has been caught. Please keep in mind that hairstyles, beards and mustaches are easily changed. Also, pictures do not always depict the true complexion of a person.

Please look through the pictures and study the person in each. When you have completed viewing all the pictures, tell me whether or not you can make an identification.

| Identified Photo # 5 | ☐ Could **NOT** Identify |

nments: GARCIA POINTED AT PICTURE #5 AND SAID,

" THIS ONE LOOKS LIKE HIM. ITS HIS FACE,

HAIR AND MUSTACHE." " THIS IS HIM."

000017

neup Presented By:

CORDERO, B     #336

# SAN DIEGO COUNT
# SHERIFF'S DEPARTMENT

**1**  **2**  **3**



**4**  **5**  **6**



**INSTRUCTIONS TO BE READ TO WITNESS:** Carefully review all the photographs before you make any decisions. This group of photographs may or may not contain a picture of the person who committed the crime now being investigated. Keep in mind that hair styles, beards and moustaches may be easily changed. Also, photographs may not depict the true complexion of a person. When you have looked at all of the photos, answer the questions below. Do not tell other witnesses that you have or have not identified anyone.

QUESTION #1:   DO YOU SEE ANYONE YOU RECOGNIZE?                                      CASE NUMBER:

ANSWER:

QUESTION #2:   IF THE ANSWER TO QUESTION #1 WAS YES, IDENTIFY BY NUMBER, THE PHOTO(S) YOU RECOGNIZE.

ANSWER:

QUESTION #3:   FROM WHERE DO YOU RECOGNIZE THE PERSON(S) IDENTIFIED?                    **000018**

ANSWER:

QUESTION #4:   DO YOU HAVE ANY ADDITIONAL COMMENTS?                 Jose F Garcia

ANSWER:                                                                          NAME OF WITNESS (PRINT)

SAN DIEGO COUNTY SHERIFF'S DEPARTMENT                             _____  1/14/04
P.O. BOX 429000                                                  SIGNATURE OF WITNESS / DATE
SAN DIEGO, CA 92142-9000

                                                                 F. Coulear          #336
                                                                 OFFICER'S SIGNATURE      DEPT. ID#

00256

1  WILLIAM DALEY, Esq. SBN #064002
   Attorney at Law
2  535 "H" Street
   Chula Vista, CA 91910
3  Telephone: (619) 426-2685
   Facsimile: (619) 425-4879
4

5

6  Attorney for Defendant
   JOSEPH DURAN
7

8

9

10            **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

11            **IN AND FOR THE COUNTY OF SAN DIEGO**

12  THE PEOPLE OF THE STATE OF CALIFORNIA,  )    Case No: CS 181667
                                           )
13            Plaintiff,                   )
                                           )    DECLARATION OF
14                                         )    JOSEPH DURAN
                                           )
15      v.                                 )    RE: MOTION FOR
                                           )    NEW TRIAL
16  JOSEPH DURAN                           )
                                           )
17                                         )
                                           )
18                                         )
    _____  )
19

20      I, JOSEPH DURAN, declare as follows:

21      1. At the time of trial in this matter , I was representing myself, In pro
    per.

22      2. On February 3, 2005, the last day of trial, Deputy District Attorney,

23  Minoz Bhayani, for the first time, provided a three page report from Officer E.

24  Cordero. (Attached hereto, as Exhibit A, and incorporated herein by reference).

25      The report is labeled "Detective follow-up report" to case.  The body of the

26

27

28                              -1-

1  report indicates an investigation in January 2004, however, at the bottom of

2  the report the "Date of the Report" is 9/29/2004. The report references two

3  eye witnesses , Raquel Martinez Robinson and Oscar Ochoa, who saw the

4  suspect in this case. They were shown a photographic line-up, which included

5  my picture, and neither identified me as the individual who was the suspect.

6      A defense request for discovery was filed an served on the prosecution on

7  or about November 24, 2004. A request for *Brady/Wheeler* information

8  pursuant to 1054 P.C. was made on the prosecution on or about 12/10/2004.

9  At no time did the prosecution provide this report or the names of these

10 potential witnesses. On or about January 24, 2005, I brought to the Court's

11 attention that the prosecution appeared to be withholding evidence. There was

12 a review of the reports that had been provided by the prosecution, and Exhibit

13 A, was not part of the material that I had, nor was I made aware of the

14 information regarding these witnesses at that time.

15      When I was given the report on February 3, 2005, I did not have the

16 opportunity to fully read or review the report.   This was the last day of trial

17 and I was in the middle of my cross-examination of Mr. Garcia.   Upon my brief

18 review of the report when it was give to my that morning, I believed that the

19 new witnesses listed affirmed Mr. Garcia's identification. Only after the

20 conclusion of the trial did I have the opportunity to fully review and appreciate

21 the significance of these newly identified witnesses.  I immediately contacted

22 my investigator Mr. Griffin, and requested that he make contact and interview

23 the witnesses; Raquel Martinez Robinson and Oscar Ochoa.  He then found

24 another eye  witness, Jose Morales.

25

26

27

28                                    -2-

1    Had I realized the significance of the eye witnesses inability to

2  identify me in the photo lineup which contained my picture, and the differences

3  in the physical descriptions they provided,  I would have requested that they be

4  subpoenaed for trial.   Additionally, only upon interviewing these witnesses did

5  I learn of another potential eye witness, Jose Morales, who provided another

6  different  description of the suspect.

7

8  Dated: 7.10.05.

9  
   JOSEPH DURAN

10

-3-

Continued on
OFFICER'S REPORT ONLY

**San Diego Regional**
**Officer's Report**
**Narrative**

0 0 2 5 6

| Code Section And Description (one incident only) PC / 215(A) / CARJACKING | | Date 01/11/2004 | Page 1 of 3 | Case Number 0400313 |
| --- | --- | --- | --- | --- |
| | | | Day of Week SUN | Time 11:25 |
| Location Of Incident (Or Address) 909 MILE OF CARS WAY | | City NATIONAL CITY | District | Beat 242 |
| Person(s) Involved: Victim McCune, Chrysler Jeep | | | | |
| Suspect (If Named) Duran, Joseph Alfonso | | | | |
| Property Tag No.(s) | | | | |

## Detective Follow-up Report

On January 11, 2004, Officer Gisi took a Carjacking report that occurred at McCune Chrysler Jeep. According to this report, a Hispanic male adult (suspect) approached Jose F. Garcia, sales representative and inquired about buying a used vehicle. Garcia allowed the suspect to take a 2000 green Jeep for a test drive. The suspect drove the Jeep off the sales parking lot while Garcia sat in the passengers seat. Once out of the parking lot, the suspect pulled into a parking lot and asked Garcia to remove a balloon, which was tied to this vehicle. Before Garcia could exit the Jeep, the suspect lifted his shirt exposing the handle of a black medium size automatic handgun inside his waistband. The suspect told Garcia, *"Why don't you get the fuck out."* Fearing for his life, Garcia complied. The suspect drove off westbound on Mile of Cars Way.

On January 12, 2004, at about 2255 hours, Officer M. Helms from the San Diego Sheriff Department stopped and arrested **Joseph Alfonso Duran** in the 2000 Jeep Wrangler stolen during the carjacking on January 11, 2004.

On January 12, 2004, at about 2330 hours, Officer Walters was informed of the arrest of Duran. Officer Walters responded to 8811 Cuyamaca Street in Santee in attempts to obtain a statement from Duran. Refer to Officer Walters' supplemental report for additional information.

I was later subsequently assigned to conduct a follow-up investigation.

I went to the San Diego Sheriff Departments Records Division and complied a photo line-up containing Duran's picture and five filler pictures. Duran's picture was placed in position #5 in the photo line-up. See attached photo line-up for additional information.

I called McCune Chrysler Jeep in attempts to locate Jose Garcia, but was informed he was not due in until later in the day. I left a message for Garcia to contact me at the Police Station. I later spoke with Garcia and requested he come down to the police station.

On January 14, 2004, at about 1455 hours, Garcia arrived at the National City Police Department. I escorted Garcia to the Investigations Division and informed him that I was going to show him a photo line-up. At about 1500 hours, I read Garcia the photo line-up admonishment and handed him a colored photo line-up. Garcia looked at the photo line-up, pointed at Duran's picture and said, *"This one looks like him. It's his face, hair and mustache. This is him."* I handed Garcia a black and white copy of the photo line-up and had him, date, circle and initial the picture he pointed out. Attached is a photocopy of the photo line-up along with the National City Police Department Photo Line-up Form.

While talking with Garcia, I learned that two other employees, Raquel Martinez Robinson and Oscar Ochoa of McCune Chrysler Jeep, might have had contact with Duran on January 11, 2004.

| Reporting Officer | | ID # 336 | Division INV | Approved By R. G. Triviz | Date of Report 09/29/2004 | Time 08:16 |
| --- | --- | --- | --- | --- | --- | --- |

ORIGINAL                                                                  Continued Y

| Continued, OFFICER'S REPORT ONLY | San Diego Regional Officer's Report Narrative — | 002 62 of 3 | Page 3 | Case Number 0400313 |
|---|---|---|---|---|

| Code Section And Description (one incident only) PC / 215(A) / CARJACKING | Date 01/11/2004 | Day of Week SUN | Time 11:25 | |
|---|---|---|---|---|
| Location Of Incident (Or Address) 325 MILE OF CARS WAY | | City NATIONAL CITY | District | Beat 242 |

Person(s) Involved: Victim
McCune, Chrysler Jeep

Suspect (If Named)
Duran, Joshua Antonio

Property Tag No.(s)

At about 1530 hours, I went to McCune Chrysler Jeep and contacted Raquel Martinez Robinson. I informed Robinson of my investigation and obtained the following statement.

**Raquel Martinez Robinson** is an employee of McCune Chrysler Jeep and is a new cars sales representative.

On Sunday, January 11, 2004, before 12:00 P.M., a Hispanic male adult (suspect) walked onto the property inquiring about a new Jeep Wrangler. The suspect told Robinson that his mother had given him $15,000.00 dollars and he needed a car to get away. The suspect additionally told Robinson that his name was Joseph, his health was failing and he was not working. Robinson felt uncomfortable with the suspect and referred him to another sales representative. Robinson spent no more than ten minutes with the suspect. Robinson later learned that the suspect had carjacked an employee from the used car lot during a test drive.

Robinson described the suspect as a Hispanic male adult, between 25 and 30 years old with short black hair and a pocked face.

After obtaining Robinson's statement, I read her the photo line-up admonishment and handed her the photo line-up. Robinson looked at the photo line-up; however, she could not make an identification.

At about 1600 hours, I contacted Oscar Ochoa, informed him of the investigation and obtained the following statement.

**Oscar Ochoa** is an employee of McCune Chrysler Jeep. Ochoa works in the used car parking lot.

On Sunday, January 11, 2004, Ochoa saw a Hispanic male adult (suspect) walking from the new car parking lot to the used car parking lot. The suspect was about thirty feet away when Ochoa told Garcia, *"Go help the guy. If you sell him a car, you give me half."* Garcia assisted the suspect. Ochoa later learned that the suspect had carjacked Garcia.

Ochoa described the suspect as a Hispanic male adult, about 30 years old, with black hair and a mustache. The suspect was wearing sunglasses, a blue t-shirt, tan jacket and dark pants. Ochoa does not believe he could identify the suspect if seen again.

After obtaining Ochoa's statement, I read him the photo line-up admonishment and handed him the photo line-up. Ochoa looked at the photo line-up; however, he could not make an identification.

I later impounded the photo line-up signed by Garcia and the National City Police Department Photo Line-up Form at NCPD.

## Impounded Evidence

| Reporting Officer E.CORDERO | ID # 336 | Division INV | Approved By R. G. Triviz | Date of Report 09/29/2004 | Time 03:16 |
|---|---|---|---|---|---|

ORIGINAL                                    Continued Y

| Continued From OFFICER'S REPORT ONLY | San Diego Regional Officer's Report Narrative | | | 0026 | | Page 3 of 3 | | Case Number 0400313 |
|---|---|---|---|---|---|---|---|---|
| Code Section And Description (one incident only) PC / 215(A) / CARJACKING | | | Date 01/11/2004 | | Day of Week SUN | | Time 11:25 | |
| Location Of Incident (Or Address) 325 MILE OF CARS WAY | | | | City NATIONAL CITY | | | District | Beat 242 |
| Person(s) Involved: Victim McCune, Chrysler Jeep | | | | | | | | |
| Suspect (If Named) Duran, Joseph Alfonso | | | | | | | | |
| Property Tag No.(s) | | | | | | | | |

Tag No.                          Description

I0024280                         A NCPD Photo Line-up Form.
                                 A color photo line-up.
                                 A black and white signed photo line-up.

| Reporting Officer E.CORDERO. | ID # 336 | Division INV | Approved By R. G. Triviz | Date of Report 09/29/2004 | Time 08:16 |
|---|---|---|---|---|---|

ORIGINAL                                    Continued Y

002b2

1 | WILLIAM DALEY, Esq. SBN #064002
Attorney at Law
2 | 535 "H" Street
Chula Vista, CA 91910
3 | Telephone: (619) 426-2685
Facsimile: (619) 425-4879
4

5

6 | Attorney for Defendant
JOSEPH DURAN
7

8

9

10      **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

11      **IN AND FOR THE COUNTY OF SAN DIEGO**

12 | THE PEOPLE OF THE STATE OF CALIFORNIA,      Case No: CS 181667

13         Plaintiff,

14                    Declaration of
Frank C. Griffin
15      v.

16 | JOSEPH DURAN           RE: MOTION FOR
NEW TRIAL

17

18

19

20       I, Frank C. Griffin, declare as follows:

21       1. I am a licensed private investigator, and at the request of Joseph

22 | Duran, when he was in Pro Per status, was asked to interview the following

23 | individuals:

24

25

26

27

28                  -1-

JUL 11 2005

00263

1     2. On February 11, 2005, I conducted a telephone interview with Raquel

2  Martinez Robinson. She indicated that on January 11, 2004 between 11 and

3  12 noon she was working at McCune Chrysler/Jeep when had been

4  approached by a potential customer looking to purchase a Jeep. She identified

5  the person as follows:

6     Between the ages 23 & 24; he did not have graying hair, his hair was

7  slicked back and curly, medium complexion, no sunglasses, eyes brown and a

8  little beady. She did not recall a broken arm or any statement about failing

9  health. He spoke only English without any accent. He was about 5 feet 9

10  inches in height. He had a thin build. She was shown a photo lineup but could

11  not identify anyone in the photos. She indicated that she referred him to a

12  salesman, Jose Morales, because she was uncomfortable dealing with him.

13  She spent 10 minutes with him and feels that she could have identified him

14  from a physical lineup.

15     3. I spoke to Oscar Ochoa at Ron Baker Chevrolet/ Isuzu on February

16  10, 2005. He indicated that on January 11, 2004 between 11 am. and 12 noon

17  he saw a Hispanic male walking from the new car lot at McCune Chrysler Jeep.

18  When he was approximately 30 to 50 feet from him he told Mr. Garcia to take

19  care of him and if he got a sale he would get half. He indicated that he had

20  been shown a photo line-up by the police, but he was unable to identify anyone

21  in the photographs he was shown. He indicated he may be able to identify the

22  individual if he saw him in person.

23     4. On February 25, 2005, I conducted a telephonic interview of Jose

24  Morales. Mr. Morales indicated that on January 11, 2004 between 11a.m. and

25

26

27

28                        -2-

00264

1   12 noon a Hispanic male had been referred to him by Mrs. Robinson., at

2   McCune Chrysler/Jeep.  The individual said that they were looking for a jeep

3   Wrangler.  He went to get the keys one of the Wranglers, and the person was

4   gone.  He learned that the same individual had car jacked a car from the used

5   car lot.  He described the individual as follows:

6        20-21 years of age; skinny, didn't think he had on sun glasses; 5 feet 6

7   inches to 5 feet 7 inches in height, Hispanic, spoke only in English with no

8   accent.  He had a jacket draped over his arm.  The individual made no mention

9   of his health.  He had light brown hair which was a little messy.  He said the

10  police never interviewed him and that he could still possibly identify the

11  individual.

12       I declare under penalty of perjury that the foregoing is true and correct

13  on _June 30 2005_, at _Chula Vista_ California.

14

15

16                                    Frank C. Griffin
                                      Private Investigator

17

18

19

20

21

22

23

24

25

26

27

28                          -3-

00265

1  WILLIAM DALEY, Esq. SBN #064002
   Attorney at Law
2  535 "H" Street
   Chula Vista, CA 91910
3  Telephone: (619) 426-2685
   Facsimile: (619) 425-4879
4

5

6  Attorney for Defendant
   JOSEPH DURAN
7

8

9

        **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
10
        **IN AND FOR THE COUNTY OF SAN DIEGO**
11

12  THE PEOPLE OF THE STATE OF CALIFORNIA,  )    Case No: CS 181667

13              Plaintiff,                  )
                                           )    Declaration of
14                                          )    Raquel Martinez
                                           )     Robinson
15       v.                                 )
                                           )
16  JOSEPH DURAN                            )
                                           )
17                                          )
                                           )
18                                          )
                                           )
19  _____)

20       I, Raquel Martinez Robinson, declare as follows:

21       On January 11, 2004 between 11 and 12 noon I was working at McCune
22
    Chrysler/Jeep when I had been approached by a potential customer looking to
23
    purchase a Jeep.  He appeared  as follows:
24
    ///
25

26  _____

27
                                -1-
28

00266

1    Between the ages 23 & 24; he did not have graying hair, his hair was

2  slicked back and curly, medium complexion, no sunglasses, eyes brown and a

3  little beady. I do not recall a broken arm or any statement about failing health.

4  He spoke only English without any accent.  He was about 5 feet 9 inches in

5  height. He had a thin build.  I was shown a photo lineup but could not identify

6  anyone in the photos.  I referred him to a salesman, Jose Morales, because I

7  was uncomfortable dealing with him.  I spent 10 minutes with him and feel

8  that I could have identified him from a physical lineup.

9    I declare under penalty of perjury that the foregoing is true and correct

10  on June 29th 2005    , at San Diego_____ California.

11

12

13                                      _Raquel M Robinson_
                                        Raquel Martinez Robinson

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                              -2-

00267

1   WILLIAM DALEY, Esq. SBN #064002
    Attorney at Law
2   535 "H" Street
    Chula Vista, CA 91910
3   Telephone: (619) 426-2685
    Facsimile: (619) 425-4879
4

5                                                    FILED
                                              SAN DIEGO SUPERIOR COURT
6   Attorney for Defendant
    JOSEPH DURAN                                   JUL 13 2005
7
                                              CLERK OF THE SUPERIOR COURT
8                                                  M. COLAHAN

9

10              SUPERIOR COURT OF THE STATE OF CALIFORNIA

11              IN AND FOR THE COUNTY OF SAN DIEGO

12   THE PEOPLE OF THE STATE OF CALIFORNIA, )      Case No: CS 181667

13              Plaintiff,                  )      AMENDED
                                            )      DECLARATION OF
14                                          )      JOSEPH DURAN
                                            )
15       v.                                 )      RE: MOTION FOR
                                            )      NEW TRIAL
16   JOSEPH DURAN                           )
                                            )
17                                          )
                                            )
18                                          )
                                            )
19   _____      )

20       I, JOSEPH DURAN, declare as follows:

21       1.  At the time of trial in this matter , I was representing myself, In pro
     per.
22       2.  On February 3, 2005, the last day of trial, Deputy District Attorney,

23   Minoz Bhayani, for the first time, provided a three page report from Officer E.

24   Cordero.  (Attached hereto, as Exhibit A, and incorporated herein by reference).

25       The report is labeled "Detective follow-up report" to case.  The body of the

26

27   _____

28                            -1-

00268

1  report indicates an investigation in January 2004, however, at the bottom of
2  the report the "Date of the Report" is 9/29/2004.  The report references two
3  eye witnesses , Raquel Martinez Robinson and Oscar Ochoa, who saw the
4  suspect in this case.  They were shown a photographic line-up, which included
5  my picture, and neither identified me as the individual who was the suspect.

6      A defense request for discovery was filed an served on the prosecution on
7  or about November 24, 2004.  A request for *Brady/Wheeler* information
8  pursuant to 1054 P.C.  was made on the prosecution on or about 12/10/2004.
9  At no time did the prosecution provide this report or the names of these
10  potential witnesses.  On or about January 24, 2005, I brought to the Court's
11  attention that the prosecution appeared to be withholding evidence.  There was
12  a review of the reports that had been provided by the prosecution, and Exhibit
13  A, was not part of the material that I had, nor was I made aware of the
14  information regarding these witnesses at that time.

15      When I was given the report on February 3, 2005, I did not have the
16  opportunity to fully read or review the report.   This was the last day of trial
17  and I was in the middle of my cross-examination of Mr. Garcia.   Upon my brief
18  review of the report when it was give to my that morning, I believed that the
19  new witnesses listed affirmed Mr. Garcia's identification.  Only after the
20  conclusion of the trial did I have the opportunity to fully review and appreciate
21  the significance of these newly identified witnesses.  I immediately contacted
22  my investigator Mr. Griffin, and requested that he make contact and interview
23  the witnesses; Raquel Martinez Robinson and Oscar Ochoa.  He then found
24  another eye  witness, Jose Morales.

-2-

00269

1        Had I realized the significance of the eye witnesses inability to

2  identify me in the photo lineup which contained my picture, and the differences

3  in the physical descriptions they provided, I would have requested that they be

4  subpoenaed for trial.   Additionally, only upon interviewing these witnesses did

5  I learn of another potential eye witness, Jose Morales, who provided another

6  different  description of the suspect.

7        I declare under penalty perjury, under the laws of the State of California

8  that the foregoing is true and correct on _____ July 12 _____ , at

9  San Diego _____ , California

10  Dated: 7.11.04

12                    JOSEPH DURAN

-3-

| Continued From: OFFICER'S REPORT ONLY | | San Diego Regional Officer's Report Narrative          00270 | | Page 1 of 3 | Case Number 0400313 |
|---|---|---|---|---|---|

| Code Section And Description (one incident only) PC / 215(A) / CARJACKING | | | Date 01/11/2004 | Day of Week SUN | Time 11:25 |
|---|---|---|---|---|---|
| Location Of Incident (Or Address) 000 MILE OF CARS WAY | | | City NATIONAL CITY | District | Bea 242 |
| Person(s) Involved: Victim McCune, Chrysler Jeep | | | | | |
| Suspect (If Named) Duran, Joseph Alfonso | | | | | |
| Property Tag No.(s) | | | | | |

## Detective Follow-up Report

On January 11, 2004, Officer Gisi took a Carjacking report that occurred at McCune Chrysler Jeep. According to this report, a Hispanic male adult (suspect) approached Jose F. Garcia, sales representative and inquired about buying a used vehicle. Garcia allowed the suspect to take a 2000 green Jeep for a test drive. The suspect drove the Jeep off the sales parking lot while Garcia sat in the passengers seat. Once out of the parking lot, the suspect pulled into a parking lot and asked Garcia to remove a balloon, which was tied to this vehicle. Before Garcia could exit the Jeep, the suspect lifted his shirt exposing the handle of a black medium size automatic handgun inside his waistband. The suspect told Garcia, *"Why don't you get the fuck out."* Fearing for his life, Garcia complied. The suspect drove off westbound on Mile of Cars Way.

On January 12, 2004, at about 2255 hours, Officer M. Helms from the San Diego Sheriff Department stopped and arrested **Joseph Alfonso Duran** in the 2000 Jeep Wrangler stolen during the carjacking on January 11, 2004.

On January 12, 2004, at about 2330 hours, Officer Walters was informed of the arrest of Duran. Officer Walters responded to 8811 Cuyamaca Street in Santee in attempts to obtain a statement from Duran. Refer to Officer Walters' supplemental report for additional information.

. was later subsequently assigned to conduct a follow-up investigation.

. went to the San Diego Sheriff Departments Records Division and complied a photo line-up containing Duran's picture and five filler pictures. Duran's picture was placed in position #5 in the photo line-up. See attached photo line-up for additional information.

. called McCune Chrysler Jeep in attempts to locate Jose Garcia, but was informed he was not due in until later in the day. I left a message for Garcia to contact me at the Police Station. I later spoke with Garcia and requested he come down to the police station.

On January 14, 2004, at about 1455 hours, Garcia arrived at the National City Police Department. I escorted Garcia to the Investigations Division and informed him that I was going to show him a photo line-up. At about 1500 hours, I read Garcia the photo line-up admonishment and handed him a colored photo line-up. Garcia looked at the photo line-up, pointed at Duran's picture and said, *"This one looks like him. It's his face, hair and mustache. This is him."* I handed Garcia a black and white copy of the photo line-up and had him, date, circle and initial the picture he pointed at. Attached is a photocopy of the photo line-up along with the National City Police Department Photo Line-up Form.

While talking with Garcia, I learned that two other employees, Raquel Martinez Robinson and Oscar Ochoa of McCune Chrysler Jeep, might have had contact with Duran on January 11, 2004.

| Reporting Officer E. CORDERO | ID # 336 | Division INV  – | Approved By R. G. Triviz | Date of Report 09/29/2004 | Time 08:16 |
|---|---|---|---|---|---|

ORIGINAL                                                                Continued Y

| Continued Case OFFICER'S REPORT ONLY | | San Diego Regional Officer's Report Narrative 00271 | | Page 2 of 3 | Case Number 0400313 |
|---|---|---|---|---|---|
| Code Section And Description (one incident only) PC / 215(A) / CARJACKING | | | Date 01/11/2004 | Day of Week SUN | Time 11:25 |
| Location Of Incident (Or Address) 325 MILE OF CARS WAY | | | City NATIONAL CITY | | District | Beat 242 |
| Person(s) Involved: Victim McCune, Chrysler Jeep | | | | | |
| Suspect (If Named) | | | | | |
| Property Tag No.(s) | | | | | |

At about 1530 hours, I went to McCune Chrysler Jeep and contacted Raquel Martinez Robinson. I informed Robinson of my investigation and obtained the following statement.

    <u>Raquel Martinez Robinson</u> is an employee of McCune Chrysler Jeep and is a new cars sales representative.

    On Sunday, January 11, 2004, before 12:00 P.M., a Hispanic male adult (suspect) walked onto the property inquiring about a new Jeep Wrangler. The suspect told Robinson that his mother had given him $15,000.00 dollars and he needed a car to get away. The suspect additionally told Robinson that his name was Joseph, his health was failing and he was not working. Robinson felt uncomfortable with the suspect and referred him to another sales representative. Robinson spent no more than ten minutes with the suspect. Robinson later learned that the suspect had carjacked an employee from the used car lot during a test drive.

    Robinson described the suspect as a Hispanic male adult, between 25 and 30 years old with short black hair and a pocked face.

After obtaining Robinson's statement, I read her the photo line-up admonishment and handed her the photo line-up. Robinson looked at the photo line-up; however, she could not make an identification.

At about 1600 hours, I contacted Oscar Ochoa, informed him of the investigation and obtained the following statement

    <u>Oscar Ochoa</u> is an employee of McCune Chrysler Jeep. Ochoa works in the used car parking lot.

    On Sunday, January 11, 2004, Ochoa saw a Hispanic male adult (suspect) walking from the new car parking lot to the used car parking lot. The suspect was about thirty feet away when Ochoa told Garcia, *"Go help the guy. If you sell him a car, you give me half."* Garcia assisted the suspect. Ochoa later learned that the suspect had carjacked Garcia.

    Ochoa described the suspect as a Hispanic male adult, about 30 years old, with black hair and a mustache. The suspect was wearing sunglasses, a blue t-shirt, tan jacket and dark pants. Ochoa does not believe he could identify the suspect if seen again.

After obtaining Ochoa's statement, I read him the photo line-up admonishment and handed him the photo line-up. Ochoa looked at the photo line-up; however, he could not make an identification.

I later impounded the photo line-up signed by Garcia and the National City Police Department Photo Line-up Form at NCPD.

Impounded Evidence

| Reporting Officer E. CORDERO | | ID # 336 | Division INV | Approved By R. G. Triviz | Date of Report 09/29/2004 | Time 08:16 |
|---|---|---|---|---|---|---|
| | | | ORIGINAL | | | Continued Y |

00283

CC: Research Atty

1  WILLIAM DALEY, Esq. SBN #064002
   Attorney at Law
2  531 "H" Street
   Chula Vista, CA 91910
3  Telephone: (619) 426-2685
   Facsimile: (619) 425-4879
4
5
6  Attorney for Defendant
   JOSEPH DURAN
7
8
9
10
11

12  THE PEOPLE OF THE STATE OF CALIFORNIA,    ) Case No: CS 181667
                                              )
13                        Plaintiff,          )
                                              )  SUPPLEMENTAL
14                                            )  POINTS AND
                                              )  AUTHORITIES
15             v.                             )  MOTION FOR NEW
                                              )   TRIAL
16                                            )
     JOSEPH DURAN                             )
17                                            )
                                              )
18                                            )  Date: 8/16/2005
                                              )  Time: 9:00 A.M
19                                            )  Dept: 15
     _____)
20
    TO: BONNIE DUMANIS, District Attorney of San Diego County and Deputy
21
    District Attorney, MINAZ A. BHAYANI,
22
    ///
23
    ///
24
25
26
27  Supplemental Points and Authorities
28                            -1-

FILED
SAN DIEGO SUPERIOR COURT

AUG 1 2 2005

CLERK OF THE SUPERIOR COURT
BY _____

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN DIEGO

00284

1

## POINTS AND AUTHORITIES

2          The prosecution is required to disclose to the defense pursuant to Penal

3   Code Section 1054.1 (c)

4          "All relevant real evidence seized or obtained as a part of the investigation

5   of the offenses charged."....

6          (d) Any exculpatory evidence."

7

8          The prosecution must also disclose this information when it is reasonably

9   accessible to the prosecution.  *In re Littlefield* (1993) 5 C4th 122;  *People v.*

10  *Little* (1997) 50 CA4th 426.  In any event the prosecutor is presumed to have

11  knowledge of all information gathered by the investigating agency .  *In re Brown*

12  (1998) 17 C4th 873.

13          The People have not provided any explanation or justification for the

14  failure to provide significant information regarding eye-witness evidence to the

15  defense until the end of the trial in this case.  Attached hereto, and

16  incorporated by reference is a declaration of Frank C Griffin, a licensed private

17  investigator indicating that Sgt. Cordero of the National City Police prepared

18  the written report regarding the witnesses on or about September 29, 2004.

19  Further that the report would have been provided the District Attorney's office,

20  Shortly after the preparation, and well in advance of the trial which began

21  January 24, 2005.

22  ///

23  ///

24  ///

25

26

27  Supplemental Points and Authorities

28                          -2-

00285

1    A belated argument that these witnesses would not have changed the

2 outcome, and that Mr. Duran's failure to request a continuance when the

3 report was finally provided at the end to the trial, makes mockery of the

4 provisions and requirement of of 1054.1 P.C. and the requirement of due

5 process.

6    Defendant requests that the motion for a new trial be granted.

7

8

9 Dated: 8/12/05                    Respectfully Submitted,

10

11

12 WILLIAM DALEY
   Attorney for Defendant

13

14

15

16

17

18

19

20

21

22

23

24

25

26

---

27 Supplemental Points and Authorities

28                          -3-

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name and Address): | TELEPHONE NO: | FOR COURT USE ONLY |
|---|---|---|
| William D. Daily, Esq. SBN #064002<br>535 H Street<br>Chula Vista, CA 91910 | (619) 425-2685 | 00286 |
| ATTORNEY FOR (Name): JOSEPH DURAN | | |

| NAME OF COURT: | Superior Court, State of California | |
|---|---|---|
| STREET ADDRESS: | County of San Diego, County Courthouse | |
| MAILING ADDRESS: | 220 West Broadway | AUG 1 2 2005 |
| CITY AND ZIP CODE: | San Diego, CA 92101 | |
| BRANCH NAME: | | |

| PLAINTIFF/PETITIONER: | People of the State of California |
|---|---|
| DEFENDANT/RESPONDENT: | Joseph Duran |

| DECLARATION | CASE NUMBER:<br>CS181667 |
|---|---|

I, FRANK C. GRIFFIN, HEREBY STATE AND DECLARE:

That I am a California licensed private investigator, license #PI 19771, and have been assigned by the Private Conflict Counsel to provide investigation services for attorney William D. Daily on behalf of defendant Joseph Duran.

With regard to San Diego Regional Officer's Report Narrative/Detective Follow-up Report - Case Number 0400313 (dated 9/29/2004, reporting officer E. Cordero, ID #336), on July 15, 2005 at approximately 12:20 PM, I contacted reporting officer Sgt. Cordero concerning the date that the Detective follow-up Report was turned over to the District Attorney. Sgt. Cordero stated that there is no way to know the exact day, but that it would have been shortly after the date of the report documented at the bottom of said report, which is 9/29/2004.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:    August 8, 2005

Frank C. Griffin
(TYPE OR PRINT NAME)

(SIGNATURE OF DECLARANT)

☐ Petitioner/Plaintiff    ☐ Respondent/Defendant    ☐ Attorney

☑ Other (specify): Private Investigator

**DECLARATION**

00352

# SUPERIOR COURT OF CALIFORNIA
## COUNTY OF SAN DIEGO

DATE: February 3, 2005      DEPT 15      REPORTER A: Nellie Landeros
CSR# 3986

PRESENT HON. RAYMOND EDWARDS, JR.      REPORTER B:

CLERK: Maureen Colahan

BAILIFF: Neil Carpenter/Blanca Zarate      REPORTERS ADDRESS: PO BOX 120128
SAN DIEGO, CA 92112-0128

---

SCS181667      THE PEOPLE OF THE STATE OF CALIFORNIA, Plaintiff,
By Minaz Bhayani, Deputy District Attorney,

vs.

DA BAN29801      JOSEPH ALFONSO DURAN, Defendant,
In Propria Persona.

---

9:00 a.m. This being the time set for further **JURY TRIAL** in the above-entitled cause, having been continued from February 2, 2005, Deputy District Attorney Minaz Bhayani appears on behalf of the People. The defendant appearing in propria persona is personally present. Out of the presence of the jury, court convenes. The Court and counsel discuss jury instructions and witnesses.

9:14 a.m. The Court is at ease awaiting the arrival of witness Jose Fernando Garcia.

9:19 a.m. The jurors are present and **TRIAL RESUMES. JOSE FERNANDO GARCIA**, previously sworn, is further examined on behalf of the People.

9:28 a.m. Witness Jose Fernando Garcia is excused subject to recall. **ESTELA CORDERO, NCPD**, is sworn and examined on behalf of the People.

9:42 a.m. **MICHAEL HELMS, SDSO**, is sworn and examined on behalf of the People.

9:43 a.m. The following Court's Exhibit is marked for identification on behalf of the People:

     3. Photo board with photos (A – D) of Wal-Mart entrance, parking lot, stop sign, and turn pocket

00353

**PEOPLE V. DURAN**          **SCS181667**          **02-03-05**          **PAGE 2 OF 3**

9:47 p.m.  A reported side-bar conference is held with witness Michael Helms until 9:48 a.m. when examination of Michael Helms continues.

10:15 a.m.  **WADE WALTERS, NCPD**, is sworn and examined on behalf of the People.

10:25 a.m.  A reported side-bar conference is held until 10:38 a.m. when the jury is admonished and excused for the morning break.

10:39 a.m.  Out of the presence of the jury, the Court and counsel discuss Defendant's request to admit an x-ray of his arm.  The Court seeks an offer of proof from the Defendant regarding the x-ray.  The Court **denies** Defendant's request to admit the x-ray of his arm.  The Court discusses with the Defendant whether has a proof of service for witness Gregory Gisi, NCPD.

10:55 a.m.  Court is in recess.

11:12 a.m.  Out of the presence of the jury, Court reconvenes with counsel as noted above and the defendant present.  Mr. Bhayani indicates to the Court his witness John Gary has been ill and just learned he would be needed to testify today.  The witness will not be available until 11:40 a.m. and Mr. Bhayani requests to either to take a break until that time or re-open his case when the witness appears.  The Court will allow Mr. Bhayani to re-open his case when the witness is available.

11:17 a.m.  The jurors are now present.  The following People's Exhibits are received in evidence:  1, 2, 3, 5, 6, 7, 8, 9, and 10.  The People rest.

11:18 a.m.  Defendant **JOSEPH ALFONSO DURAN** is sworn and examined on his own behalf.

11:47 a.m.  The Defense rests.

11:54 a.m.  The People will not call witness John Gary.  The People previously rested.

11:56 a.m.  The Court instructs the jurors to return at 2:00 p.m., as the Court and counsel need to discuss jury instructions at 1:30 p.m.  The jurors are admonished and excused for the noon break, and court is in recess.

1:45 p.m.  Out of the presence of the jury, Court reconvenes with counsel as noted above and the defendant present.  Court and counsel review jury instructions on the record.

2:20 p.m.  Court is in recess while copies of the jury instructions are printed and copied.

00354

**PEOPLE V. DURAN**        **SCS181667**        **02-03-05**        **PAGE 3 OF 3**

2:46 p.m. Court reconvenes with Deputy District Attorney Bhayani, the defendant in propria persona, and the jurors present.

2:50 p.m. The People present closing argument.

3:11 p.m. The Defense presents closing argument.

3:28 p.m. The People present rebuttal argument.

3:33 p.m. The jurors are admonished and excused for the afternoon break, and court is in recess.

3:47 p.m. Court reconvenes with counsel as noted above, the defendant, and the jurors present. Counsel stipulate that Court's Exhibit 7, the 911 tape, is genuine and authentic. The Court now instructs the jury in the law applicable to this case and reviews the verdict forms. The complete set of the instructions will be provided to the jurors during deliberations.

4:36 p.m. The jurors are admonished and excused and directed to return on **Friday, February 4, 2005, at 9:00 a.m. in Department 15.**  The defendant remains in custody with bail set at $35,000. Court is adjourned.

-mac-